UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SYSTEM1 OPCO, LLC,                                              :
                                                               :
                              Plaintiff,                        :     Case No.  26-cv-01187
                 -against-                                      :
                                                               :     **SUMMONS**
SUNDAY MARKET MEDIA INC., RING OF MEDIA                         :
LLC, PAUL COZZOLINO,                                            :
                              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

        YOU ARE HEREBY SUMMONED to answer the complaint in this action and to

serve a copy of your answer on plaintiff's undersigned attorney within 20 days after the service of

this summons, exclusive of the day of service (or within 30 days after the service is complete if

this summons is not personally delivered to you within the State of New York); and in case of your

failure to appear or answer, judgment will be taken against you by default for the relief demanded

in the complaint.

        The basis of the venue is 28 U.S.C. § 1391(b)(3).

Dated:    New York, New York
          February 12, 2026

                        TORYS LLP

                        By:

_____
Erica R. S. Goldman

1114 Avenue of the Americas, 23rd Floor
New York, New York 10036
Tel: (212) 880-6000
egoldman@torys.com

*Attorneys for Plaintiff System1 OpCo, LLC*

To:

SUNDAY MARKET MEDIA INC.
1001 Wharf Street #300
Victoria BC V8W 1T6

RING OF MEDIA LLC
1309 Coffeen Avenue, Suite 1200
Sheridan, WY 82801 USA

PAUL COZZOLINO
1762 Beach Drive
Victoria, B.C.
V8R 6J2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SYSTEM1 OPCO, LLC,                                      :

                                        Plaintiff,      :      Case No. 26-cv-01187

                            -against-                   :      **COMPLAINT**

                                                        :

SUNDAY MARKET MEDIA INC., RING OF MEDIA              :
LLC, PAUL COZZOLINO,                                   :

                                        Defendants.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiff System1 OpCo, LLC ("Plaintiff" or "System1"), by its attorneys Torys LLP, for its complaint against defendants Sunday Market Media Inc. ("Sunday"), Ring of Media LLC ("Ring"), and Paul Cozzolino ("Cozzolino"), in his individual capacity (together, "Defendants"), states as follows:

## PRELIMINARY STATEMENT

1.      This is an action for breach of contract and fraudulent inducement, and, in the alternative, for breach of the implied duty of good faith and fair dealing, and unjust enrichment. System1's claims for relief relate to two agreements for digital marketing services performed by plaintiff System1 for defendants Sunday and Ring. Defendant Cozzolino is the CEO of Sunday and sole Manager and significant equity holder in Ring.

2.      In connection with System1's performance of Services[1] under services agreements it entered with Sunday and Ring (the "Sunday Agreement" and "Ring Agreement," respectively), Sunday and Ring were contractually obligated to pay System1 on Net30 terms via direct wire payment on a rolling monthly basis after Sunday and Ring received their monthly search revenue payments from Google. Despite System1's compliance with the Sunday Agreement and the Ring

---

[1] Terms used herein and not otherwise defined in this Complaint shall have the meanings ascribed to them in the Sunday Agreement and the Ring Agreement, respectively.

Agreement, Sunday and Ring have refused now for months to compensate System1. In reliance on Sunday's false promises of payment, System1 quickly and significantly scaled Sunday's Google AdSense for Search ("AFS") revenue. While System1 has generated for Sunday and Ring a combined tens of millions of dollars in AFS revenue for which Sunday and Ring have already been paid by Google, System1 has not been paid a penny since October 2025—it is now owed over $7.5 million. Instead, Sunday and Ring have unilaterally revoked System1's contractually mandated access to their respective Google AFS accounts, hurled falsehoods and hyperbole in response to System1's demand letter, and stonewalled System1's attempts to work in good faith towards resolving the outstanding payment defaults under the Sunday and Ring Agreements, respectively.

3. Despite System1's continuous monthly expenditures of significant out-of-pocket costs to generate revenue on Sunday and Ring's behalf through the provision of Services contemplated by the Sunday Agreement and Ring Agreement, respectively, System1 has been left holding the bag, while Sunday, Ring, and Mr. Cozzolino retain the benefits of System1's work. System1 has suffered monetary damages of not less than $7,553,643.59, exclusive of its costs, fees and interest.

**THE PARTIES**

4. Plaintiff System1 OpCo, LLC ("System1") is a Delaware limited liability company with its principal place of business in Los Angeles, California 90066, USA. System1 operates an industry-leading responsive acquisition marketing platform powered by Artificial Intelligence and machine learning.

5. Upon information and belief, Defendant Sunday Market Media Inc. ("Sunday") is a British Columbian corporation with its last known principal place of business in Victoria, British Columbia V8W 1T6. Sunday is an enterprise scale performance marketing company.

4

6.      Upon information and belief, Defendant Ring of Media LLC is a Wyoming limited liability company with its principal place of business in Sheridan, Wyoming 82801, USA.

7.      Upon information and belief, Defendant Paul Cozzolino is an individual and resident in Victoria, British Columbia. Mr. Cozzolino also is the Chief Executive Officer of Sunday Market Media Inc. and the sole Manager of Ring of Media LLC, in which he holds a substantial beneficial ownership interest.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332.

9.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(3) because the operative agreements provide that Sunday and Ring "irrevocably consent[] to exclusive personal jurisdiction and venue in the state and federal courts in New York County, New York."

## FACTS RELEVANT TO THE CLAIMS FOR RELIEF

A.  Sunday Market Media Services Agreement

10.      On or about October 15, 2024, Sunday Market Media Inc. ("Sunday") and System1 OpCo, LLC ("System1") entered into that certain Services Agreement, inclusive of the Standard Terms and Conditions and the list of Company Websites, annexed thereto as Schedules 1 and 2, respectively (the "Sunday Agreement").

11.      The Sunday Agreement contains a one-year Initial Term ending October 15, 2025, which automatically renewed for an additional one-year term on or about October 15, 2025. The Sunday Agreement currently remains in full force and effect.

12.     Pursuant to the Sunday Agreement, System1 agreed to provide Sunday with the "Services," defined as: (1) Ad Serving Technology Services; (2) Account Management Services (Exclusive); (3) Content Creation & Website Development Services; (4) Revenue Reporting Services; and (5) and Webhosting Services.

13.     Ad Serving Technology Services is further defined in the Sunday Agreement as:

> the services provided by System1 that consist of processes, tools and functionality deployed through System1's proprietary technology and infrastructure platform that are provided to the Company pursuant to this Agreement and utilized by the Subdomains on the Company Website(s) in order to deliver or render and properly log/track Query data, Paid Click data and Search Results or Search Links (including, but not limited to, related search on content and similar features) related to all activity on the Subdomains on the Company Website(s).

14.     Account Management Services is further defined in the Sunday Agreement as:

> serving as the Company's publishing, traffic acquisition and advertising manager for the Subdomains of the Company Website(s). In connection with providing the Account Management Services, the Company shall provide System1 with reasonably requested and/or required account administrative access for the Company's AFS account(s) related to each of the Company Website(s) for purposes of providing the Account Management Services.

15.     Content Creation & Website Development Services is further defined in the Sunday Agreement as:

> the development and creation by System1 of all ad creatives, ad copy, consumer facing content and other related media (collectively, "Content & Creatives"), in each case, which shall be developed and created in a manner consistent with the Company's brand guidelines, logos and other creative materials provided by the Company to System1 in order to ensure the Company Website(s) are consistent with the Company's consumer-facing properties. For the avoidance of doubt, the Company understands and acknowledges that System1 shall implement AI-assisted processes in connection with providing the Content Creation and Website Development Services.

16.     Revenue Reporting Services is further defined in the Sunday Agreement as:

revenue and associated analytics, including, but not limited to, any
Paid Click performance reporting metrics deployed through
System1's proprietary technology and infrastructure platform on the
Company Website(s), and which may be available to the Company
through System1's standard partner console.

17.     Webhosting Services is further defined in the Sunday Agreement as:

means providing all technical infrastructure to host the Subdomains
of the Company Website(s) and for all Results Pages, content page(s),
and/or advertisement(s) to resolve for end-Users, so that Search
Results are displayed on the Subdomains of the Company Websites.

18.     System1 agreed to provide Sunday with the Services in exchange for the revenue

share arrangement set forth in Section 3 of the Sunday Agreement, entitled "Fees and Payment."

Specifically, Section 3 states that System1 is entitled to retain 99% of all Search Revenue generated

through Sunday's Google AFS account assigned to the seven (7) Company Websites (and their

associated Subdomains) set forth in Schedule 2 of the Sunday Agreement ("System1 Revenue").

The remaining 1% of all Search Revenue is retained by Sunday ("Sunday Retained Revenue").

19.     Sections 2(d) and 8(a) of the Standard Terms and Conditions of the Sunday

Agreement detail the regular and consistent payment process between System1 and Sunday. After

each calendar month, Google pays Sunday the amounts payable for Search Revenue generated

through the Services that System1 performed during the preceding month with respect to each of

the identified Company Websites/Subdomains (the "Google Monthly Payments"). The Google

Monthly Payments to Sunday occur approximately three (3) weeks after the conclusion of each

calendar month for which System1 provided the Services to Sunday. Because the AFS accounts are

maintained and operated by Sunday, the Google Monthly Payments are made directly to Sunday.

During the time that System1 had access to the Google AFS account per the terms of the Sunday

Agreement, System1 was able to confirm and verify the amount of each Google Monthly Payment

and thereafter submitted a monthly invoice to Sunday for the monthly revenue share payable to

System1 for the Services provided under the Sunday Agreement (the "System1 Invoices"). Thereafter, Sunday then initiates a wire transfer for the benefit of System1 for all amounts due and owing to System1 for Services rendered in the preceding month within three (3) business days of its receipt of the Google Monthly Payments.

20.     To the extent there were any discrepancies in the payment process outlined in Section 8(a) of the Terms and Conditions, the parties agreed to discuss them in good faith.

21.     In connection with providing the Services contemplated in the Sunday Agreement, System1 expended substantial out-of-pocket monthly sums on either direct media spend or media spend incurred by its agency partners (for which System1 was responsible for reimbursing through buyside accounts) to drive internet traffic to content published on Sunday's Company Websites/Subdomains ("Out-of-Pocket Expenses"). This process, in turn, generates advertising revenue from Google's AFS product (*i.e.*, the Search Revenue) that is then shared between the parties according to the express terms of the Sunday Agreement payment provisions more fully set forth above.

B.  <u>Sunday Induces System1 to Perform Services to Scale Revenue</u>

22.     After the parties had entered the Sunday Agreement in October 2024, on or about February 26, 2025, Mr. Cozzolino's wife (Breanne Storey Cozzolino), an employee of Sunday and on behalf of Sunday wrote to System1, stating that the Search Revenues to date were not sustainable "as [Sunday] scale[s]" and proposed amending the Sunday Agreement to convert the amount of Search Revenue to be retained by Sunday from the originally contemplated percentage share to a flat monthly fee per Company Website/Subdomain in order to "justify [Sunday's] continued participation" in the commercial arrangement (*i.e.*, the Sunday Agreement).

23.     While Sunday and System1 continued the discussions related to amending the Sunday Agreement, on or about February 27, 2025, Mr. and Ms. Cozzolino held a teleconference call with System1's President, Publishing & Syndication, Mark Huerta, seeking to understand the status of System1's efforts to perform the Services in such a manner in order to scale the Search Revenue derived from the Company Websites/Subdomains. Mr. Huerta advised Mr. & Mrs. Cozzolino to reference Sunday's daily revenue tab within its Google AFS account tab for the month of February, at which point the Cozzolino's verbally acknowledged to Mr. Huerta that System1 had sufficiently scaled Sunday's Search Revenue to warrant maintaining the existing commercial arrangement on the terms set forth in the original Sunday Agreement.

24.     In order to scale the Search Revenue generated through Google's AFS product, and with Sunday's knowledge and at Sunday's insistence, System1 not only performed the Services in accordance with the Sunday Agreement, but it also incurred substantial Out-of-Pocket Expenses. System1 undertook these efforts in reliance on Sunday's representations in its written correspondence to and verbal discussions with representatives of System1 and on Sunday's contractual obligations to timely pay the System1 invoices in accordance with the Sunday Agreement.

25.     As Sunday's Search Revenue generated by System1 on Sunday's behalf began to increase significantly in March and April 2025 as compared to February 2025, Sunday unsurprisingly dropped its request to amend the Sunday Agreement from a percentage of Search Revenue to a flat monthly fee structure, as the existing arrangement would result in higher monthly amounts to Sunday Market. The Sunday Agreement currently remains in place as originally entered between the parties.

C.  <u>System1 Successfully Scales Sunday Revenues</u>

26.    Beginning on February 25, 2025, System1 sent Sunday an invoice dated January 30, 2025, for the fees associated with the Services it performed for Sunday in connection with the Sunday Agreement during the month of December 2024, in the amount of $5,711.42.

27.    Also on February 25, 2025, System1 sent Sunday an invoice dated January 31, 2025, for the fees associated with the Services it performed for Sunday in connection with the Sunday Agreement during the month of January 2025, in the amount of $169,896.94.

28.    On February 26, 2025, and after its verified receipt of the Google Monthly Payment, Sunday wired System1 payment for the fees associated with the Services for the months of December 2024, and January 2025, respectively, combined in the total amount of $175,608.36.

29.    On March 3, 2025, System1 sent Sunday an invoice dated February 28, 2025, for the fees associated with the Services it performed for Sunday in connection with the Sunday Agreement for the month of February 2025, in the amount of $749,673.83. On March 24, 2025, and after its verified receipt of the Google Monthly Payment, Sunday wired System1 payment for the fees associated with the Services in the amount of $749,673.83.

30.    On April 2, 2025, System1 sent Sunday an invoice dated March 31, 2025, for the fees associated with the Services it performed for Sunday in connection with the Sunday Agreement for the month of March 2025, in the amount of $2,101,425.59—representing a nearly 300% increase in revenue month-over-month. On April 22, 2025, and after its verified receipt of the Google Monthly Payment, Sunday wired System1 payment for the fees associated with the Services in the amount of $2,101,425.59.

31.     On April 23, 2025, Ms. Cozzolino, on Sunday's behalf, wrote to System1 to "share a quick summary of the Q1 2025 chargebacks," which reflected minimal advertiser credit chargebacks as a percentage of total Search Revenue generated of only 0.79%, 0.64%, and 0.36% for the months of January through March, respectively. Sunday concluded: "We're very appreciative of the strong growth this quarter—especially the significant ramp in March volume. Thank you for your continued trust and collaboration."

32.     On or about April 30, 2025, System1 sent Sunday an invoice dated April 30, 2025, for the fees associated with the Services it performed for Sunday in connection with the Sunday Agreement for the month of April 2025, in the amount of $1,956,018.17. On May 27, 2025, and after its verified receipt of the Google Monthly Payment, and resolving a small billing discrepancy in good faith, Sunday wired System1 payment for the fees associated with the Services in the amount of $1,955,998.17.

33.     On June 12, 2025, System1 sent Sunday an invoice dated May 31, 2025, for the fees associated with the Services it performed for Sunday in connection with the Sunday Agreement for the month of May 2025, in the amount of $2,166,172.65. On June 25, 2025, and after its verified receipt of the Google Monthly Payment, and resolving a small billing discrepancy in good faith, Sunday wired System1 payment for the fees associated with the Services in the amount of $2,155,552.08.

34.     On July 11, 2025, System1 sent Sunday an invoice dated June 30, 2025, for the fees associated with the Services it performed for Sunday in connection with the Sunday Agreement for the month of June 2025, in the amount of $2,834,268.21—representing another roughly 25% increase in revenue month-over-month. On July 22, 2025, and after its verified receipt of the

Google Monthly Payment, Sunday wired System1 payment for the fees associated with the Services in the amount of $2,834,268.21.

35.     On August 25, 2025, System1 sent Sunday an invoice dated July 31, 2025, for the fees associated with the Services it performed for Sunday in connection with the Sunday Agreement for the month of July 2025, in the amount of $2,919,301.75. On August 25, 2025, and after its verified receipt of the Google Monthly Payment, Sunday wired System1 payment for the fees associated with the Services in the amount of $2,919,301.75.

36.     On September 29, 2025, System1 sent Sunday an invoice dated August 31, 2025, for the fees associated with the Services it performed for Sunday in connection with the Sunday Agreement for the month of August 2025, in the amount of $2,968,636.36. On October 2, 2025, and after its verified receipt of the Google Monthly Payment, Sunday wired System1 payment for the fees associated with the Services in the amount of $2,968,636.36.

37.     On October 7, 2025, System1 sent Sunday an invoice dated September 30, 2025, for the fees associated with the Services it performed for Sunday in connection with the Sunday Agreement for the month of September 2025, in the amount of $4,221,689.92. On October 22, 2025, and after its verified receipt of the Google Monthly Payment, Sunday wired System1 payment for the fees associated with the Services in the amount of $4,221,689.92.

D.   Sunday Breaches Its Payment Obligations

38.     On or about October 31, 2025, System1 sent Sunday an invoice for the fees associated with the Services it performed for Sunday in connection with the Sunday Agreement for the month of October 2025, in the amount of $3,576,716.39. As with all prior invoices issued by System1 to Sunday, the terms of the October 2025 invoice were no later than Net30 from the end of

the prior calendar month, but with payment by wire transfer due within three (3) business days of its receipt of the Google Monthly Payment for October (which Sunday actually received on or about November 21, 2025), and in no event later than November 30, 2025. To date, System1 has not been paid for the Services it performed for Sunday in October 2025.

39.     On or about November 30, 2025, System1 sent Sunday an invoice for the fees associated with the Services it performed for Sunday in connection with the Sunday Agreement for the month of November 2025, in the amount of $3,735,694.22. The November 2025 invoice likewise was no later than Net30 but actually due and payable by wire transfer within three (3) business days of its receipt of the Google Monthly Payment for November (which Sunday actually received on or about December 22, 2025), but in no event no later than December 30, 2025. To date, System1 has not been paid for the Services it performed for Sunday in November 2025.

40.     On or about December 31, 2025, System1 sent Sunday an invoice for the fees associated with the Services it performed for Sunday in connection with the Sunday Agreement for the month of December 2025, in the amount of $193,586.83. To date, System1 has not been paid for the Services it performed for Sunday in December 2025.

E.   Sunday Breaches AFS Account Access Provision

41.     Pursuant to Section 2(c) of the Sunday Agreement, Sunday contractually agreed to provide System1 with access to its Google AFS account related to for the Company Websites/Subdomains for which System1 provided Services. The Company Websites (and corresponding Subdomains) included the seven (7) websites listed in Schedule 2 of the Sunday Agreement.

42.     Sunday complied with Section 2(c) of the Sunday Agreement and provided System1 with access to the Google AFS account on or about October 15, 2024. However, upon information and belief, on or about January 19, 2026, Sunday unilaterally—and without warning or notice to System1—revoked System1's Google AFS account access. System1 has been unable to access Sunday's Google AFS account since. System1 cannot provide the Services to Sunday under the Sunday Agreement without access to the AFS account. Nor can System1 properly track Search Revenue and invoice Sunday as is contractually required by the Sunday Agreement, absent Google AFS account access.

43.     System1 sent Sunday a letter addressed to Mr. Cozzolino dated January 21, 2026, demanding immediate payment of the October and November invoices (as the invoice for the month of December 2025 was not yet then past due), and noting Sunday's breaches of the Sunday Agreement, including its unilateral revocation of System1's access to the Google AFS accounts (the "Demand Letter"). The Demand Letter also notified Sunday of the potential for litigation and its document preservation obligations in connection with same. On Friday January 30, 2026, counsel to Sunday finally responded to System1's Demand Letter with correspondence filled with unfounded allegations and significant falsehoods.

F.   Ring of Media Agreement

44.     Given the commercial success of the partnership between System1 and Sunday under the Sunday Agreement as recently as mid-October 2025, Sunday and System1 renewed discussions regarding the prospect of System1 providing the same Services for another company, Ring of Media LLC ("Ring"), which is owned and managed by Mr. Cozzolino. Ring also maintained its own, separate Google AFS account through which System1 was to provide Services and from which System1 and Ring would derive Search Revenue.

45.     On or about October 30, 2025, Ring and System1 entered that certain Services

Agreement, inclusive of the Standard Terms and Conditions and the Company Websites, annexed

thereto as Schedules 1 and 2, respectively (the "Ring Agreement").

46.     The Ring Agreement contains a one-year Initial Term ending October 30, 2026. The

Ring Agreement currently remains in full force and effect.

47.     In all substantive respects, the Ring Agreement is identical to the Sunday

Agreement, including the Services offered, the payment provisions, and Google AFS account

access provisions.

G.    Ring of Media Breaches Its Payment Obligations

48.     On or about January 18, 2026, System1 sent Ring an invoice dated November 30,

2025, for the fees associated with the Services it performed for Ring in connection with the Ring

Agreement for the month of November 2025, in the amount of $26,427.38. As with the invoices

issued by System1 to Sunday, the terms of the November 2025 invoice were Net30, with payment

by wire transfer due no later than December 30, 2025. To date, System1 has not been paid for the

Services it performed for Ring in November 2025.

49.     On or about January 18, 2026, System1 sent Ring an invoice dated December 31,

2025, for the fees associated with the Services it performed for Ring in connection with the Ring

Agreement for the month of December 2025, in the amount of $21,218.77. As with the November

2025 Ring invoice, the terms of the December 2025 invoice were Net30, with payment by wire

transfer due no later than January 30, 2026. To date, System1 has not been paid for the Services it

performed for Ring in December 2025.

H. <u>Ring of Media Breaches AFS Account Access Provision</u>

50.    Pursuant to Section 2(c) of the Ring Agreement, Ring had agreed to provide System1 with access to the company's Google AFS account related to Ring's Company Website/Subdomains for which System1 provided Services. The Company Websites (and corresponding Subdomains) included those listed in Schedule 2 of the Ring Agreement.

51.    Ring complied with Section 2(c) of the Ring Agreement and provided System1 with access to the AFS account on or about October 30, 2025. However, upon information and belief, on or about January 18, 2026, Ring unilaterally—and without warning or notice to System1—similarly revoked System1's Google AFS account access. System1 has been unable to access Ring's AFS account since. System1 cannot provide the Services to Ring under the Ring Agreement without access to the AFS account. Nor can System1 properly track Search Revenue and invoice Ring as is contractually required by the Ring Agreement, absent the Google AFS account access.

I. <u>Cozzolino Dominates Sunday and Ring of Media and the Corporate Veil Should be Pierced</u>

52.    Upon information and belief, Mr. Cozzolino exercises complete dominion and control over Sunday and Ring in respect of their respective contractual relationships with System1. In that regard, Mr. Cozzolino has abused the privileges of doing business in the corporate form on Sunday and Ring's behalf vis à vis System1.

53.    Paul Cozzolino is the CEO of Sunday and the sole Manager of Ring. He also holds a greater than 10% beneficial ownership in Ring, which, upon information and belief, is closer to 100%.

54.    Upon information and belief, Mr. Cozzolino did not adhere to corporate formalities in respect of Sunday and Ring. The companies are not adequately capitalized, and funds are being

deposited and withdrawn from the corporation for personal rather than corporate purposes. Further, there is overlap of principals and employees between Sunday and Ring.

55.     Mr. Cozzolino used his domination of Sunday and Ring to commit a fraud or wrongdoing against System1, and System1 has been significantly and materially harmed.

56.     For these reasons, any obligation owing by Sunday and/or Ring to System1, should be imposed on Mr. Cozzolino, in his individual capacity.

**FIRST CLAIM FOR RELIEF**
**(Breach of Contract as Against Sunday and**
**Cozzolino, In His Individual Capacity - Payments)**

57.     System1 repeats and realleges the allegations contained in Paragraphs 1 through 56, as if fully set forth herein.

58.     The Sunday Agreement is an existing, valid and enforceable contract.

59.     System1 has performed all conditions, covenants and promises that it was required to perform under the Sunday Agreement.

60.     Sunday breached the Sunday Agreement by failing to pay System1 its invoices for Services it performed for Sunday for the months of October, November, and December 2025, in accordance with the Sunday Agreement.

61.     As a result of Sunday's failure to pay System1 for Services rendered pursuant to the Sunday Agreement, System1 has suffered damages in an amount not less than $7,505,997.44, exclusive of interest, fees, costs, and its out-of-pocket expenses, all to be determined at trial.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract as Against Ring of Media and
### Cozzolino, In His Individual Capacity - Payments)

62.     System1 repeats and realleges the allegations contained in Paragraphs 1 through 61 as if fully set forth herein.

63.     The Ring Agreement is an existing, valid and enforceable contract.

64.     System1 has performed all conditions, covenants and promises that it was required to perform under the Ring Agreement.

65.     Ring breached the Ring Agreement by failing to pay System1 its invoices for Services it performed for Ring for the months of November and December 2025, in accordance with the Ring Agreement.

66.     As a result of Ring's failure to pay System1 for Services rendered pursuant to the Ring Agreement, System1 has suffered damages in an amount not less than $47,646.15, exclusive of interest, fees, costs, and its out-of-pocket expenses, all to be determined at trial.

## THIRD CLAIM FOR RELIEF
### (Breach of Contract as Against Sunday and
### Cozzolino, In His Individual Capacity – Google AFS Account Access)

67.     System1 repeats and realleges the allegations contained in Paragraphs 1 through 66, as if fully set forth herein.

68.     The Sunday Agreement is an existing, valid and enforceable contract.

69.     System1 has performed all conditions, covenants and promises that it was required to perform under the Sunday Agreement.

70.     Sunday breached the Sunday Agreement by unilaterally revoking System1's access to its Google AFS accounts as required by and in accordance with the Sunday Agreement.

71.     As a result of Sunday's revocation of the Google AFS account access, System1 has suffered damages in an amount that cannot presently be calculated but to be determined at trial.

### FOURTH CLAIM FOR RELIEF
**(Breach of Contract as Against Ring and
Cozzolino, In His Individual Capacity – Google AFS Account Access)**

72.     System1 repeats and realleges the allegations contained in Paragraphs 1 through 71, as if fully set forth herein.

73.     The Ring Agreement is an existing, valid and enforceable contract.

74.     System1 has performed all conditions, covenants and promises that it was required to perform under the Ring Agreement.

75.     Ring breached the Ring Agreement by unilaterally revoking System1's access to its Google AFS accounts as required by and in accordance with the Ring Agreement.

76.     As a result of Ring's revocation of the Google AFS account access, System1 has suffered damages in an amount that cannot presently be calculated but to be determined at trial.

### FIFTH CLAIM FOR RELIEF
**(In the Alternative, Breach of Implied Duty of Good Faith and Fair Dealing
as Against Sunday and Cozzolino, In His Individual Capacity)**

77.     System1 repeats and realleges the allegations contained in Paragraphs 1 through 76, as if fully set forth herein.

78.     On October 15, 2024, System1 and Sunday entered into the Sunday Agreement, a valid, enforceable, and binding contract.

79.     For System1 to provide the Services more fully set forth in the Sunday Agreement, Sunday agreed to provide System1 access to its Google AFS accounts. Sunday knew or had reason to know that System1 could not perform the Services without access to the Google AFS accounts.

80.     In exchange for System1 providing the Services more fully set forth in the Sunday Agreement, Sunday also agreed to pay System1 pursuant to the payment provisions in the Sunday Agreement, including, but not limited to, Section 3 of the Services Agreement, and Sections 2(d) and 8(a) of Schedule 1, the Standard Terms and Conditions.

81.     System 1 has performed all its obligations under the Sunday Agreement.

82.     System1 reasonably understood that the Sunday Agreement imposed on Sunday an implied duty of good faith and fair dealing to provide System1 with access to Sunday's Google AFS accounts, and to promptly pay System1 in exchange for the Services it provided to Sunday on a rolling monthly basis (within three (3) business days of its receipt of the Google Monthly Payment but in no event on less than Net30 terms) and in accordance with the payment terms more fully set forth therein.

83.     On or about November 30, 2025, Sunday breached the implied duty of good faith and fair dealing by withholding from System1 the benefits to which it was entitled (namely, payment) under the Sunday Agreement for the Services that System1 provided to Sunday during the preceding calendar month. Specifically, instead of sending System1 a wire payment upon receipt from Google of its Google Monthly Payment for the month of October, Sunday retained the entire Google Monthly Payment and not just the Company's Retained Revenue (as contemplated by the express terms of the Sunday Agreement) for its own personal gain at System1's expense.

84.     On or about December 30, 2025, Sunday breached the duty of good faith and fair dealing by again withholding from System1 the benefits to which it was entitled (namely, payment) under the Sunday Agreement for the Services that System1 provided to Sunday during the preceding calendar month. Specifically, instead of sending System1 a wire payment upon receipt from Google of its Google Monthly Payment for the month of November, Sunday retained the

entire Google Monthly Payment and not just the Company's Retained Revenue (as contemplated by the express terms of the Sunday Agreement) for its own personal gain at System1's expense.

85.    On or about January 30, 2026, Sunday breached the duty of good faith and fair dealing by again withholding from System1 the benefits to which it was entitled (namely, payment) under the Sunday Agreement for the Services that System1 provided to Sunday during the preceding calendar month. Specifically, instead of sending System1 a wire payment upon receipt from Google of its Google Monthly Payment for the month of December, Sunday retained the entire Google Monthly Payment and not just the Company's Retained Revenue (as contemplated by the express terms of the Sunday Agreement) for its own personal gain at System1's expense.

86.    Instead of working with System1 in good faith towards satisfying its obligations, Sunday stonewalled System1's attempts obtain the benefits of the bargain it struck with Sunday.

87.    Sunday also unilaterally revoked AFS account access to which System1 was entitled and on which System1 necessarily relies in order to provide the Services under the Sunday Agreement.

88.    As a result of Sunday's breaches, System1 has suffered damages in an amount not less than $7,505,997.44, exclusive of interest, fees, costs, and its out-of-pocket expenses, all to be determined at trial.

89.    The damages flow directly from and are the natural and probable consequence of Sunday's breaches.

**SIXTH CLAIM FOR RELIEF**
**(In the Alternative, Breach of Implied Duty of Good Faith and Fair Dealing**
**as Against Ring of Media and Cozzolino, In His Individual Capacity)**

90.    System1 repeats and realleges the allegations contained in Paragraphs 1 through 89, as if fully set forth herein.

91.    On October 30, 2025, System1 and Ring entered into the Ring Agreement, a valid, enforceable, and binding contract.

92.    For System1 to provide the Services more fully set forth in the Ring Agreement, Ring agreed to provide System1 access to its Google AFS account. Ring knew or had reason to know that System1 could not perform the Services without access to the Google AFS account.

93.    In exchange for System1 providing the Services more fully set forth in the Ring Agreement, Ring also agreed to pay System1 pursuant to the payment provisions in the Ring Agreement, including, but not limited to, Section 3 of the Services Agreement, and Sections 2(d) and 8(a) of Schedule 1, the Standard Terms and Conditions.

94.    System1 has performed all its obligations under the Ring Agreement.

95.    System1 reasonably understood that the Ring Agreement imposed on Ring an implied duty of good faith and fair dealing to provide System1 with access to Ring's Google AFS account, and to promptly pay System1 in exchange for the Services it provided to Ring on a rolling monthly basis (within three (3) business days of receipt of the Google Monthly Payment but in no event on less than Net30 terms) and in accordance with the payment terms more fully set forth therein.

96.    On or about December 30, 2025, Ring breached the duty of good faith and fair dealing by withholding from System1 the benefits to which it was entitled (namely, payment) under

the Ring Agreement for the Services that System1 provided to Ring during the preceding calendar month. Specifically, instead of sending System1 a wire payment upon receipt from Google of its Google Monthly Payment for the month of November, Ring retained the entire Google Monthly Payment and not just the Company's Retained Revenue (as contemplated by the express terms of the Ring Agreement) for its own personal gain at System1's expense.

97.     On or about January 30, 2026, Ring breached the duty of good faith and fair dealing by again withholding from System1 the benefits to which it was entitled (namely, payment) under the Ring Agreement for the Services that System1 provided to Ring during the preceding calendar month. Specifically, instead of sending System1 a wire payment upon receipt from Google of its Google Monthly Payment for the month of December, Ring retained the entire Google Monthly Payment and not just the Company's Retained Revenue (as contemplated by the express terms of the Sunday Agreement) for its own personal gain at System1's expense.

98.     Ring also unilaterally revoked access to its Google AFS account to which System1 was entitled and on which System1 necessarily relies in order to provide the Services under the Ring Agreement.

99.     As a result of Ring's breaches, System1 has suffered damages in an amount not less than $47,646.15, exclusive of interest, fees, costs, and its out-of-pocket expenses, all to be determined at trial.

100.    The damages flow directly from and are the natural and probable consequence of Ring's breaches.

### SEVENTH CLAIM FOR RELIEF
**(In the Alternative, Unjust Enrichment as Against Sunday
and Cozzolino, in His Individual Capacity)**

101.    Plaintiff System1 alleges in the alternative to its breach of contract claim, that

System1 is entitled to recover under the doctrine of unjust enrichment if it is determined that either

a valid and enforceable contract does not exist, the existing contract does not cover the subject

matter of the dispute between System1 and Sunday, or the existing contract is void, invalid, or

unenforceable.

102.    Between October and December 2025, System1 provided to Sunday the Services as

defined and more specifically described in the Sunday Agreement.

103.    Sunday was enriched by virtue of System1 providing Sunday with the Services in an

amount not less than $7,505,997.44, which represents the amount of Search Revenue due and

payable to System1 for providing the Services to Sunday under the terms of the Sunday Agreement,

after deducting the Company's Retained Revenue from the Google Monthly Payment.

104.    Sunday was aware and had knowledge that System1 was not providing the benefit of

the Services gratuitously, that System1 incurred significant actual Out-of-Pocket Expenses in the

form of media agency fees/expenses in order to provide the Services and that the Services held a

monetary value in the form of the fees and amounts payable to System1 under the Sunday

Agreement, which was the monthly Search Revenue less the Company's Retained Revenue.

105.    System1 has demanded that Sunday make payment to System1 for the Services in an

amount of not less than $7,505,997.44 and Sunday has refused to make payment to System1.

106.    Sunday has accepted and retained the benefit of the Services inequitably and at

System1's expense. Indeed, the Google Monthly Payments are sent directly to Sunday by Google

before the amount of Search Revenue less the Company's Retained Revenue must be remitted to System1. If the Search Revenue less the Company's Retained Revenue is not remitted to System1, then the Google Monthly Payment amounts remain in an account over which Sunday has exclusive control.

107.    System1 and Sunday had a sufficiently close relationship or connection to cause reliance or inducement by System1. System1 and Sunday maintained a business-to-business relationship for several years before entering the Sunday Agreement.

108.    As a result of Sunday's retention of the Services and the entire Google Monthly Payments for the months of October through December 2025, System1 has sustained actual and significant damages. Indeed, System1 has incurred damages of not less than $7,505,997.44 in the form of unpaid invoices for the Services that it performed for Sunday pursuant to the Sunday Agreement.

109.    For all the reasons set out above, it is against equity and good conscience to permit Sunday to retain the benefit of the Services in the form of the entire amount of the Google Monthly Payments generated through the Services provided by System1 under the terms of the Sunday Agreement.

### EIGHTH CLAIM FOR RELIEF
### (In the Alternative, Unjust Enrichment as Against Ring of Media and Cozzolino, In His Individual Capacity)

110.    Plaintiff System1 alleges in the alternative to its breach of contract claim, that System1 is entitled to recover under the doctrine of unjust enrichment if it is determined that either a valid and enforceable contract does not exist, the existing contract does not cover the subject matter of the dispute between System1 and Ring, or existing contract is void, invalid, or unenforceable.

111.    Between November and December 2025, System1 provided to Ring the Services as defined and more specifically described in the Ring Agreement.

112.    Ring was enriched by virtue of System1 providing Ring with the Services in an amount not less than $47,646.15, which represents the amount of Search Revenue due and payable to System1 for providing the Services to Ring under the terms of the Ring Agreement, after deducting the Company's Retained Revenue from the Google Monthly Payment.

113.    Ring was aware and had knowledge that System1 was not providing the benefit of the Services gratuitously, that System1 incurred significant actual Out-of-Pocket Expenses in the form of media agency fees/expenses in order to provide the Services and that the Services held a monetary value in the form of the fees and amounts payable to System1 under the Ring Agreement, which was the monthly Search Revenue less the Company's Retained Revenue.

114.    System1 has invoiced Ring for the Services it performed in an amount not less than $47,646.15 and Ring has refused to make payment to System1.

115.    Ring has accepted and retained the Services inequitably and at System1's expense. Indeed, the Google Monthly Payments are sent directly to Ring by Google before the amount of Search Revenue less the Company's Retained Revenue must be remitted to System1. If the Search Revenue less the Company's Retained Revenue is not remitted, then the Google Monthly Payment amounts remain in an account over which Ring has exclusive control.

116.    System1 and Ring had a sufficiently close relationship or connection to cause reliance or inducement by System1. Mr. Cozzolino, the CEO of Sunday, and with whom System1 had a historic business relationship as set forth above, also is a sole Manager of and an equity holder of at least 10% of Ring, and which System1 has reason to believe is significantly higher.

117.    As a result of Ring's retention of the Services and the entire Google Monthly Payments for the months of November through December 2025, Ring has sustained actual and significant damages. Indeed, System1 has incurred damages of not less than $47,646.15 in the form of unpaid invoices for the Services that it performed for Ring pursuant to the Ring Agreement.

118.    For all the reasons set out above, it is against equity and good conscience to permit Ring to retain the benefit of the Services, and the entire amount of the Google Monthly Payments generated through the Services provided by System1 under the terms of the Ring Agreement.

## NINTH CLAIM FOR RELIEF
### (Fraudulent Inducement as Against Sunday and Cozzolino, In His Individual Capacity)

119.    System1 repeats and realleges the allegations contained in Paragraphs 1 through 118, as if fully set forth herein.

120.    Sunday misrepresented that it would pay System1 the Search Revenue less the Company's Retained Revenue as set forth in the payment provisions of the Sunday Agreement in exchange for System1 not only performing the Services, but crucially, rapidly scaling those Services. Sunday induced System1 to scale the Services, which in turn resulted in a significant increase in Search Revenue and the amount of the Company's Retained Revenue with promises to pay the amounts due and payable under the existing Sunday Agreement, having already threatened to amend the Sunday Agreement to include terms it believed would be less favorable to System1 because of unsustainably low revenues.

121.    Sunday's representations (and prior course of conduct) that it would pay System1 according to the payment provisions in the Sunday Agreement were materially false and misleading because Sunday never intended to continue making the contractual payments to System1.

122.    Sunday's promise to timely pay System1 for the significant Search Revenue that System1 was able to generate for Sunday through its Google AFS account by quickly scaling its media buying and traffic acquisition efforts, or else face contract termination or amendment, is distinct from the Sunday Agreement's description of Services and payment provisions on their face.

123.    Sunday had no intention of honoring its false promises of payment when it made them because it always intended to retain for itself the benefit of the entire amount of Google Monthly Payments, and not just the contractually provided for amount of the Company's Retained Revenue.

124.    Sunday deliberately made this false promise to induce System1 to continue operating under the Sunday Agreement as drafted at the time it made the misrepresentations.

125.    System1 had no reason to doubt the veracity of Sunday's representation about remitting timely, contractual payments given its pre-existing business relationship with Sunday and Mr. Cozzolino, and its prior course of conduct of timely remitting payments to System1.

126.    As a direct and proximate result of relying on Sunday's false promise to induce System1 to provide the Services and to quickly scale the Search Revenue that System1 was able to generate for Sunday through its Google AFS account by quickly scaling its media buying and traffic acquisition efforts, and therefore increasing the Company's Retained Revenue, System1 was damaged by incurring significant Out-of-Pocket Expenses associated with the Services it performed for Sunday but for which it still has not been compensated.

127.    As a result of Sunday's fraudulent inducement of System1's performance under the Sunday Agreement, System1 is entitled to an award of damages in an amount to be proved at trial, but not less than $7,505,997.44.

**RELIEF DEMANDED**

WHEREFORE, plaintiff System1 respectfully prays for and demands judgment be granted in its favor and against defendants Sunday, Ring, and Paul Cozzolino in his individual capacity under the theory of corporate veil piercing, as follows:

(i)        Awarding, on plaintiff's breach of contract claims, specific performance directing Sunday, Ring, and/or Mr. Cozzolino, respectively, to pay the outstanding indebtedness in an amount not less than $7,553,643.59, together with interest, fees, costs, and such other and further relief as the Court deems just and proper;

(ii)        In the alternative, awarding, on plaintiff's breach of the implied duty of good faith and fair dealing claims, damages in an amount to be determined at trial but in no event less than $7,553,643.59, together with interest, fees, and costs, and such other and further relief as the Court deems just and proper;

(iii)        In the alternative, awarding, on plaintiff's unjust enrichment claims, damages in an amount to be determined at trial but in no event less than $7,553,643.59, together with interest, fees, and costs, and such other and further relief as the Court deems just and proper;

(iv)        Awarding, on plaintiff's fraudulent inducement claim, damages in an amount to be determined at trial but in no event less than $7,505,997.44, together with interest, fees, and costs, and such other and further relief as the Court deems just and proper; and

(v)        Awarding, on all claims for relief, all fees, costs and such other and further relief as the Court deems just and proper.

Dated:    New York, New York
          February 12, 2026

                              TORYS LLP

          By:

          _____
          Erica R. S. Goldman

          1114 Avenue of the Americas, 23rd Floor
          New York, New York 10036
          Tel: (212) 880-6000
          egoldman@torys.com
          *Attorneys for Plaintiff System1 OpCo, LLC*