**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SYSTEM1 OPCO, LLC,<br><br>*Plaintiff*,<br><br>v.<br><br>SUNDAY MARKET MEDIA INC., RING OF MEDIA LLC,<br><br>*Defendants*. | Case No. 26-cv-01187-CM<br><br>**DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S FIRST AMENDED COMPLAINT WITH COUNTERCLAIMS** |
| SUNDAY MARKET MEDIA INC.,<br><br>*Counterclaim- Plaintiff*,<br><br>v.<br><br>SYSTEM1 OPCO, LLC,<br><br>*Counterclaim-Defendant*. | |

Defendants Sunday Market Media Inc. ("Sunday") and Ring of Media LLC ("Ring") (together, "Defendants"), by and through their attorneys, Reed Smith LLP, hereby answer and assert affirmative defenses to Plaintiff System1 OpCo, LLC's ("Plaintiff" or "System1") First Amended Complaint in this action as follows:

## PRELIMINARY STATEMENT

1. This is an action for breach of contract and promissory fraud, and, in the alternative, for breach of the implied duty of good faith and fair dealing, and unjust enrichment. System1's claims for relief relate to two agreements for digital marketing services performed by plaintiff System1 for defendants Sunday and Ring.

**<u>RESPONSE</u>:** The allegations in this paragraph constitute conclusions of law, to which no response is required, and/or purport to characterize the Complaint. To the extent a response is

required, Defendants deny that System1 is entitled to any of the relief requested, and refers to the Complaint for a full and accurate account of its contents, which speak for themselves.

2. In connection with System1's performance of Services[1] under services agreements it entered with Sunday and Ring (the "Sunday Agreement" and "Ring Agreement," respectively), Sunday and Ring were contractually obligated to pay System1 on Net30 terms. Payments would be sent via direct wire payment on a rolling monthly basis after Sunday and Ring received their monthly search revenue payments from Google (or to be paid from a joint escrow account not unilaterally controlled by Sunday or Ring once a contractual Google Adsense for Search ("AFS") revenue threshold was met). Despite System1's compliance with its contractual obligations under each of the Sunday Agreement and the Ring Agreement throughout the duration of the period pursuant to which System1 provided its Services as required under the parties' applicable commercial arrangements, Sunday and Ring have refused now for months to compensate System1. Further, in detrimental reliance on Sunday's false promises of working in good faith to establish the joint escrow account, which would have ensured payment to System1 of its contractually entitled payments, System1 quickly and significantly scaled Sunday's Google AFS revenue.

**RESPONSE:** Defendants admit that Sunday Market and Ring entered into services agreements with System1 referred to as the Sunday Agreement and the Ring Agreement (together, the "Agreements"). Defendants refer to the Agreements for their full and complete terms and deny the allegations in this paragraph to the extent inconsistent therewith. The remaining allegations in this paragraph constitute subjective or opinion-based statements which are not susceptible of

[1] Terms used herein and not otherwise defined in this Answer to the First Amended Complaint shall have the meanings ascribed to them in the Sunday Agreement and the Ring Agreement, respectively.

admission or denial, and conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in this paragraph.

3. While System1 has generated for Sunday and Ring a combined tens of millions of dollars in Google AFS revenue for which Sunday and Ring have already been paid by Google, System1 has not been paid a penny since October 2025 (for Services provided through September 2025)—it is now owed over $7.5 million. Instead of System1 having access to funds that were supposed to be deposited into a joint escrow account, Sunday dragged its feet, mislead System1, and retained its unilateral control over those funds. To make matters worse, Sunday and Ring have unilaterally revoked System1's contractually mandated access to their respective Google AFS accounts, hurled falsehoods and hyperbole in response to System1's reasonable and factual payment demand letter, and stonewalled System1's attempts to work in good faith towards resolving the outstanding payment defaults under the Sunday and Ring Agreements, respectively.

**RESPONSE:** Defendants admit that they have not paid System1 since October 2025, and have revoked System1's access to Defendants' Google AFS accounts. The remaining allegations in this paragraph constitute subjective or opinion-based statements which are not susceptible of admission or denial, and conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in this paragraph.

4. Despite System1's continuous monthly expenditures of significant out-of-pocket costs to generate revenue on Sunday and Ring's behalf through the provision of Services contemplated by the Sunday Agreement and Ring Agreement, respectively, System1 has been left

holding the bag, while Sunday and Ring retain the benefits of System1's work. System1 has suffered monetary damages of not less than $7,553,643.59, exclusive of its costs, fees and interest.

**<u>RESPONSE</u>:** The allegations in this paragraph constitute subjective or opinion-based statements which are not susceptible of admission or denial, and conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in this paragraph, and deny that System1 is entitled to the relief requested.

## THE PARTIES

5. Plaintiff System1 OpCo, LLC ("System1") is a Delaware limited liability company with its principal place of business in Los Angeles, California 90066, USA. System1 operates an industry-leading responsive acquisition marketing platform powered by Artificial Intelligence and machine learning.

**<u>RESPONSE</u>:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and therefore deny the allegations.

6. Upon information and belief, Defendant Sunday Market Media Inc. ("Sunday") is a British Columbian corporation with its last known principal place of business in Victoria, British Columbia V8W 1T6. Sunday is an enterprise scale performance marketing company.

**<u>RESPONSE</u>:** Admitted.

7. Upon information and belief, Defendant Ring of Media LLC is a Wyoming limited liability company with its principal place of business in Sheridan, Wyoming 82801, USA.

**<u>RESPONSE</u>:** Admitted.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332.

**RESPONSE:** The allegations in this paragraph constitute conclusions of law to which no response is required. To the extent a response is required, Defendants admit the allegations.

9. Venue is proper pursuant to 28 U.S.C. § 1391(b)(3) because the operative agreements provide that Sunday and Ring "irrevocably consent[] to exclusive personal jurisdiction and venue in the state and federal courts in New York County, New York."

**RESPONSE:** The allegations in this paragraph constitute conclusions of law to which no response is required. To the extent a response is required, Defendants refer the Court to the Agreements, which speak for themselves, for their full and complete terms, and deny the allegations in this paragraph to the extent inconsistent therewith.

## FACTS RELEVANT TO THE CLAIMS FOR RELIEF

A. Sunday Market Media Services Agreement

10. In and around September 2024, John Fishman, Vice President of Business Development for System1, contacted Paul Cozzolino, the Chief Executive Officer of Sunday, who he knows from previous commercial syndication arrangements between the companies, mutual industry contacts and events about pursuing a commercial arrangement in respect of Sunday's website(s) that have related search on content ("RSoC") enabled within Google AFS platform.

**RESPONSE:** Admitted.

11. On or about October 2, 2024, Mr. Fishman and Mark Huerta, System1's President, Publishing & Syndication, had an initial call with Mr. Cozzolino and his wife, Breanne Cozzolino, the Chief Operating Officer of Sunday, to further discuss a potential commercial arrangement.

**RESPONSE:** Admitted.

12. During the October 2, 2024 call, Ms. Cozzolino raised concerns about one of the anticipated contractual requirements to a commercial arrangement: changing or updating the payee bank account linked to Sunday's Google AFS account due to previous payment or tax issues, which she perceived could negatively impact its Google AFS account or performance. The parties agreed at that time to initially allow Sunday to remain as the direct payee for Google AFS revenue because the parties understood that Sunday was also utilizing its Google AFS account for its own direct search traffic business too. This meant that to the extent that Sunday and System1 entered a commercial arrangement, any revenue generated by System1 on Sunday's behalf would likewise be held in the same Google AFS account and comingled with Sunday's direct search traffic revenue.

**RESPONSE:** Defendants admit that, during the October 2, 2024 call, the parties discussed changing or updating the payee bank account linked to Sunday Market's Google AFS account. The remaining allegations in this paragraph constitute subjective or opinion-based statements which are not susceptible of admission or denial. To the extent a response is required, Defendants deny the allegations.

13. On or about October 15, 2024, Sunday Market Media Inc. ("Sunday") and System1 OpCo, LLC ("System1") entered into that certain Services Agreement, inclusive of the Standard Terms and Conditions and the list of Company Websites, annexed thereto as Schedules 1 and 2, respectively (the "Sunday Agreement").

**RESPONSE:** Defendants admit that, on or about October 15, 2024, Sunday Market and System1 entered into the Sunday Agreement. The Sunday Agreement speaks for itself, and Defendants

refer to the document for its full and complete terms and deny the allegations in this paragraph to the extent inconsistent therewith.

14. The Sunday Agreement contains a one-year Initial Term ending October 15, 2025, which automatically renewed for an additional one-year term on or about October 15, 2025. The Sunday Agreement currently remains in full force and effect.

**RESPONSE:** The allegations in this paragraph constitute conclusions of law to which no response is required, and purport to describe the terms of the Sunday Agreement. To the extent a response is required, the Sunday Agreement speaks for itself, and Defendants refer to the document for its full and complete terms and deny the allegations in this paragraph to the extent inconsistent therewith.

15. Pursuant to the Sunday Agreement, System1 agreed to provide Sunday with the "Services," defined as: (1) Ad Serving Technology Services; (2) Account Management Services (Exclusive); (3) Content Creation & Website Development Services; (4) Revenue Reporting Services; and (5) and Webhosting Services.

**RESPONSE:** The allegations in this paragraph constitute conclusions of law to which no response is required, and purport to describe the terms of the Sunday Agreement. To the extent a response is required, the Sunday Agreement speaks for itself, and Defendants refer to the document for its full and complete terms and deny the allegations in this paragraph to the extent inconsistent therewith.

16. Ad Serving Technology Services is further defined in the Sunday Agreement as:

> the services provided by System1 that consist of processes, tools and functionality deployed through System1's proprietary technology and infrastructure platform

> that are provided to the Company pursuant to this Agreement and utilized by the Subdomains on the Company Website(s) in order to deliver or render and properly log/track Query data, Paid Click data and Search Results or Search Links (including, but not limited to, related search on content and similar features) related to all activity on the Subdomains on the Company Website(s).

**RESPONSE:** The allegations in this paragraph constitute conclusions of law to which no response is required, and purport to describe the terms of the Sunday Agreement. To the extent a response is required, the Sunday Agreement speaks for itself, and Defendants refer to the document for its full and complete terms and deny the allegations in this paragraph to the extent inconsistent therewith.

17. Account Management Services is further defined in the Sunday Agreement as:

> serving as the Company's publishing, traffic acquisition and advertising manager for the Subdomains of the Company Website(s). In connection with providing the Account Management Services, the Company shall provide System1 with reasonably requested and/or required account administrative access for the Company's AFS account(s) related to each of the Company Website(s) for purposes of providing the Account Management Services.

**RESPONSE:** The allegations in this paragraph constitute conclusions of law to which no response is required, and purport to describe the terms of the Sunday Agreement. To the extent a response is required, the Sunday Agreement speaks for itself, and Defendants refer to the document for its full and complete terms and deny the allegations in this paragraph to the extent inconsistent therewith.

18. Content Creation & Website Development Services is further defined in the Sunday Agreement as:

> the development and creation by System1 of all ad creatives, ad copy, consumer facing content and other related media (collectively, "Content & Creatives"), in each case, which shall be developed and created in a manner consistent with the Company's brand guidelines, logos and other creative materials provided by the Company to System1 in order to ensure the Company Website(s) are consistent

> with the Company's consumer-facing properties. For the avoidance of doubt, the Company understands and acknowledges that System1 shall implement AI-assisted processes in connection with providing the Content Creation and Website Development Services.

**RESPONSE:** The allegations in this paragraph constitute conclusions of law to which no response is required, and purport to describe the terms of the Sunday Agreement. To the extent a response is required, the Sunday Agreement speaks for itself, and Defendants refer to the document for its full and complete terms and deny the allegations in this paragraph to the extent inconsistent therewith.

19. Revenue Reporting Services is further defined in the Sunday Agreement as:

> revenue and associated analytics, including, but not limited to, any Paid Click performance reporting metrics deployed through System1's proprietary technology and infrastructure platform on the Company Website(s), and which may be available to the Company through System1's standard partner console.

**RESPONSE:** The allegations in this paragraph constitute conclusions of law to which no response is required, and purport to describe the terms of the Sunday Agreement. To the extent a response is required, the Sunday Agreement speaks for itself, and Defendants refer to the document for its full and complete terms and deny the allegations in this paragraph to the extent inconsistent therewith.

20. Webhosting Services is further defined in the Sunday Agreement as:

> means providing all technical infrastructure to host the Subdomains of the Company Website(s) and for all Results Pages, content page(s), and/or advertisement(s) to resolve for end-Users, so that Search Results are displayed on the Subdomains of the Company Websites.

**RESPONSE:** The allegations in this paragraph constitute conclusions of law to which no response is required, and purport to describe the terms of the Sunday Agreement. To the extent a response is required, the Sunday Agreement speaks for itself, and Defendants refer to the document for its

full and complete terms and deny the allegations in this paragraph to the extent inconsistent therewith.

21. System1 agreed to provide Sunday with the Services in exchange for the revenue share arrangement set forth in Section 3 of the Sunday Agreement, entitled "Fees and Payment." Specifically, Section 3 states that System1 is entitled to retain 99% of all Search Revenue generated through Sunday's Google AFS account assigned to the seven (7) Company Websites (and their associated Subdomains) set forth in Schedule 2 of the Sunday Agreement ("System1 Revenue"). The remaining 1% of all Search Revenue is retained by Sunday ("Sunday Retained Revenue").

**RESPONSE:** The allegations in this paragraph constitute conclusions of law to which no response is required, and purport to describe the terms of the Sunday Agreement. To the extent a response is required, the Sunday Agreement speaks for itself, and Defendants refer to the document for its full and complete terms and deny the allegations in this paragraph to the extent inconsistent therewith.

22. Given the October 2, 2024 conversation between representatives and agents of System1 and Sunday, Section 2(d) of the Standard Terms and Conditions of the Sunday Agreement contemplates that the payee for the Sunday Google AFS accounts would initially remain designated as Sunday. However, if the monthly revenue amounts payable to System1 for consecutive months exceeded a certain mutually agreed upon threshold, then the parties would endeavor to establish a joint escrow account from which both System1 and Sunday would be paid and to which System1 and Sunday would have joint access (the "Joint Escrow Account"):

> to the extent that the monthly amount payable to System1 hereunder equals or exceeds $350,000 for two (2) consecutive months or three (3) out of five (5) consecutive months at any point

> during the Term, the parties shall use commercially reasonable efforts to update the payment details for the AFS account(s) associated with each of the Company Website(s) with the payment recipient information for a joint escrow account to be established by [Sunday] and System1 on substantially market terms with respect to the mechanics, timing, and payment frequency to be mutually agreed.

**RESPONSE:** The allegations in this paragraph constitute conclusions of law to which no response is required, and purport to describe the terms of the Sunday Agreement. To the extent a response is required, the Sunday Agreement speaks for itself, and Defendants refer to the document for its full and complete terms and deny the allegations in this paragraph to the extent inconsistent therewith.

23. The Joint Escrow Account requirement in the Sunday Agreement was specifically put in place to ensure that, upon achieving consistent, scaled monthly revenue, System1 would not be at the sole whim of Sunday in respect of receiving and retaining the significant amounts payable to System1 under the Sunday Agreement. In other words, the requirement to implement the Joint Escrow Account was intended to avoid or negate the exact scenario for which System1 seeks relief in this matter (*i.e.* payment of amounts that Sunday indisputably owes to System1 under the terms of the Sunday agreement).

**RESPONSE:** The allegations in this paragraph constitute conclusions of law to which no response is required, and purport to describe the terms of the Sunday Agreement. To the extent a response is required, the Sunday Agreement speaks for itself, and Defendants refer to the document for its full and complete terms and deny the allegations in this paragraph to the extent inconsistent therewith.

24. Sections 2(d) and 8(a) of the Standard Terms and Conditions of the Sunday Agreement further detail the monthly payment process contemplated between the parties. After each calendar month, Google pays Sunday the amounts payable for Search Revenue generated through the Services that System1 performed during the preceding month with respect to each of the identified Company Websites/Subdomains (the "Google Monthly Payments"). The Google Monthly Payments to Sunday occur approximately three (3) weeks after the conclusion of each calendar month for which System1 provided the Services to Sunday. Because the Google AFS accounts are/were set up for Sunday to be the payee for Google search revenue, the Google Monthly Payments were only to be made directly to Sunday until such time as System1 sufficiently scaled the revenue to trigger the Joint Escrow Account requirement under the Sunday Agreement. During the time that Sunday remained the payee for Google search revenue prior to the creation of the Joint Escrow Account and while System1 had online access to the Google AFS account per the terms of the Sunday Agreement, System1 was able to confirm and verify the amount of each Google Monthly Payment and thereafter submitted a monthly invoice to Sunday for the monthly revenue share payable to System1 for the Services provided under the Sunday Agreement (the "System1 Invoices"). Thereafter, Sunday would then initiate a wire transfer for the benefit of System1 for all amounts due and owing to System1 for Services rendered in the preceding month within three (3) business days of its receipt of the Google Monthly Payments.

**RESPONSE:** The allegations in this paragraph constitute conclusions of law to which no response is required, and purport to describe the terms of the Sunday Agreement. To the extent a response is required, the Sunday Agreement speaks for itself, and Defendants refer to the document for its full and complete terms and deny the allegations in this paragraph to the extent inconsistent therewith.

25. To the extent there were any discrepancies in the payment process outlined in Section 8(a) of the Terms and Conditions, the parties agreed to discuss them in good faith.

**RESPONSE:** The allegations in this paragraph constitute conclusions of law to which no response is required. To the extent a response is required, the Sunday Agreement speaks for itself, and Defendants refer to the document for its full and complete terms and deny the allegations in this paragraph to the extent inconsistent therewith.

26. In connection with providing the Services contemplated in the Sunday Agreement, System1 expended substantial out-of-pocket monthly sums on either direct media spend, or media spend incurred by its agency partners (for which System1 was responsible for reimbursing through buyside accounts) to drive internet traffic to content published on Sunday's Company Websites/Subdomains ("Out-of-Pocket Expenses"). This process, in turn, generates advertising revenue from Google's AFS product (*i.e.*, the Search Revenue) that is then shared between the parties according to the express terms of the Sunday Agreement payment provisions more fully set forth above (*i.e.*, 99% to System1 and 1% to Sunday). Given the nature of the industry, System1's significant Out-of-Pocket Expenses typically skewed closely to the resulting System1 Revenue figures for any given month. To wit, the margin on the Google AFS search revenue payable to System1 under the Sunday Agreement is approximately only 10-15% above System1's Out-of-Pocket Expenses to drive such revenue.

**RESPONSE:** The Sunday Agreement speaks for itself, and Defendants refer to the document for its full and complete terms and deny the allegations in this paragraph to the extent inconsistent therewith. Defendants otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.

B. Sunday Seeks to Amend the Agreement and Induce System1 to Scale Revenue

27. Beginning in February 2025, Sunday, through its CEO Paul Cozzolino and its COO Breanne Cozzolino, sought to amend the Sunday Agreement for two reasons: (1) to convert the payment terms from a percentage of search revenue to a flat fee because Sunday initially thought that this would be financially more advantageous to them; and (2) to remove the Joint Escrow Account requirements.

**RESPONSE:** Defendants admit that, beginning in or around February 2025, Sunday Market's CEO Paul Cozzolino and COO Breanne Cozzolino engaged in discussions with System1 regarding payment terms in the Sunday Agreement. The remaining allegations in this paragraph constitute conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations.

28. On or about February 26, 2025, Ms. Cozzolino, on Sunday's behalf, wrote to System1, stating that the Search Revenues to date were not sustainable "as [Sunday] scale[s]". She indicated that Sunday intended to either terminate the Sunday Agreement or amend the Sunday Agreement to convert the revenue share amount to a flat monthly fee construct to "justify [Sunday's] continued participation" in the existing commercial (and contractual) arrangement.

**RESPONSE:** Defendants admit that Breanne Cozzolino is Cozzolino's wife and an employee of Sunday Market, and that she corresponded with System1 on or about February 26, 2025. That correspondence speaks for itself and Defendants refer to that correspondence for its full and complete content, and deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this paragraph.

29. On or about February 27, 2025, Mr. and Ms. Cozzolino, on behalf of Sunday, held a teleconference call with Mr. Huerta. Using the threat of potentially terminating the Sunday Agreement to induce System1 to scale the search revenue more quickly, the Cozzolinos inquired about the status of System1's efforts to scale the Search Revenue derived from the Company Websites/Subdomains for which System1 was providing Services to Sunday under the Sunday Agreement. Mr. Huerta responded by referring to Sunday's daily revenue tab within its Google AFS account tab for the month of February. Upon reviewing the Search Revenue figures for the month of February to date, the Cozzolinos verbally acknowledged to Mr. Huerta that System1 already had begun to sufficiently scale Sunday's Search Revenue within the Sunday Google AFS Account. The Cozzolinos and Sunday ultimately did not pursue this amendment.

**RESPONSE:** The allegations in this paragraph include subjective or opinion-based statements which are not susceptible of admission or denial. Defendants admit the remaining allegations in this paragraph.

30. On March 11, 2025, however, Ms. Cozzolino, on behalf of Sunday, wrote to System1 with a different purported rationale for a proposed amendment to the Sunday Agreement:

> we would like to amend the bank detail clause in the original agreement. Specifically, we are no longer comfortable with the requirement to update the payment details for the AFS account(s) to a joint escrow account once the payment thresholds are met. Please let us know how you'd like to proceed with modifying this clause.

**RESPONSE:** Defendants admit that Breanne Cozzolino corresponded with System1 on or about February 26, 2025. That correspondence speaks for itself and Defendants refer to that correspondence for its full and complete content, and deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this paragraph.

31. Upon realizing that System1 was indeed scaling the search revenue under the Sunday Agreement, which would require the parties to implement the Joint Escrow Account after the month of March 2025, it appeared that Sunday no longer wished to relinquish its unilateral control over the payee account to which Google AFS search revenue was directly paid by Google.

**<u>RESPONSE</u>:** The allegations in this paragraph constitute subjective or opinion-based statements which are not susceptible of admission or denial, and conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in this paragraph.

32. As a pretext for their basis to delay implementing the Joint Escrow Account required by the Sunday Agreement, Sunday claimed that it still needed to migrate its direct search traffic generating Google AFS search revenue to a separate Google AFS account before it would be willing to establish the Joint Escrow Account with System1 in order to avoid comingling Google AFS search revenue streams.

**<u>RESPONSE</u>:** The allegations in this paragraph constitute subjective or opinion-based statements which are not susceptible of admission or denial, and conclusions of law to which no response is required. To the extent a response is required, Defendants admit that Sunday Market proposed migrating its direct search traffic generating Google AFS search revenue to a separate Google AFS account prior to establishing the Joint Escrow Account, and otherwise deny the allegations in this paragraph.

33. Mr. Huerta responded to Ms. Cozzolino on March 11, 2025:

> Given that the new plan is for Sunday Market to solely contain System1 activity once you migrated S[unday] M[arket] activity out, any reason not to move to a [Joint Escrow Account] as originally proposed? We would then pay you your rev share on

> our RSoC activity and any other revenue associated with your
> AFC content arb.

**RESPONSE:** Defendants admit that Mr. Huerta corresponded with Ms. Cozzolino on or about March 11, 2025. That correspondence speaks for itself and Defendants refer to that correspondence for its full and complete content, and deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this paragraph.

34. Ms. Cozzolino did not initially directly respond to Mr. Huerta and, on March 16, 2025, instead sent a revised version of a proposed amendment to the Sunday Agreement removing altogether Section 2(d)'s Joint Escrow Account requirement.

**RESPONSE**: Defendants admit that Ms. Cozzolino corresponded with Mr. Huerta on or about March 16, 2025. That correspondence speaks for itself and Defendants refer to that correspondence for its full and complete content, and deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this paragraph.

35. Mr. Huerta responded the same day with System1's mark-up of Sunday's proposed revisions to the Sunday Agreement. Instead of removing Section 2(d)'s Joint Escrow Account requirement, System1 set a June 1, 2025 target date for Sunday to migrate its direct search traffic (*i.e.* non-System1 generated search traffic) out of the Sunday Google AFS Account in order to assuage Sunday's concerns about any potential comingling of funds.

**RESPONSE:** Defendants admit that Mr. Huerta corresponded with Ms. Cozzolino on March 16, 2025. That correspondence speaks for itself and Defendants refer to that correspondence for its full and complete content, and deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this paragraph.

36. On March 18, 2025, Ms. Cozzolino responded that Sunday was uncomfortable setting a firm deadline for migrating Sunday's direct search traffic:

> I'm just a bit hesitant about including a specific date. I'd prefer not to set a firm timeline, but if necessary, I'd feel more comfortable with later date, like September 1st. That way, we can avoid having to revise the addendum again if the transition takes longer than expected.

**RESPONSE:** Defendants admit that Ms. Cozzolino corresponded with Mr. Huerta on or about March 18, 2025. That correspondence speaks for itself and Defendants refer to that correspondence for its full and complete content, and deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this paragraph.

37. Mr. Huerta responded on March 19, 2025:

> Thanks Breanne, I do want to keep a sense of urgency around the account migrations. I understand you need site approvals in your other account in order to complete the transition but we need to keep a reasonable date in the agreement and do everything we can to pace to it. Happy to discuss on a call, or move to July 15 in the contract if that helps pad things. Ideally this is a non issue and you are able to transition much sooner.

**RESPONSE:** Defendants admit that Mr. Huerta corresponded with Ms. Cozzolino on March 19, 2025. That correspondence speaks for itself and Defendants refer to that correspondence for its full and complete content, and deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this paragraph.

38. Ms. Cozzolino responded on March 24, 2025:

> July 15th sounds reasonable to me. The only reason I originally suggested September 1st is because I'll be out of the office from mid-July through September 1st, and I was hoping to avoid managing redlines and agreement negotiations during that time. That said, I'm happy for us to target July 15th, with September 1st still reflected in the agreement as a fallback

> date—understanding that we're all working toward wrapping this up before summer. What are your thoughts?

**RESPONSE:** Defendants admit that Ms. Cozzolino corresponded with Mr. Huerta on or about March 24, 2025. That correspondence speaks for itself and Defendants refer to that correspondence for its full and complete content, and deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this paragraph.

39. Mr. Huerta responded the same day that he agreed with the July 15 date but that the parties would "then try to get the joint account setup prior to [Ms. Cozzolino's July 15-September 1] break."

**RESPONSE:** Defendants admit that Mr. Huerta corresponded with Ms. Cozzolino on March 24, 2025. That correspondence speaks for itself and Defendants refer to that correspondence for its full and complete content, and deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this paragraph.

40. The parties never entered into any amendment to the Sunday Agreement on this basis either. The Joint Escrow Account requirement as originally contemplated in the Sunday Agreement remained in full force and effect. However, System1 agreed outside of the Sunday Agreement that it would allow Sunday to delay establishing the Joint Escrow Account until it migrated is direct search traffic out of the Sunday Google AFS account, based on the Cozzolinos' representations that Sunday (and the Cozzolinos specifically) would in good faith promptly work to move such direct traffic in a timely manner (and in no event later than mid-July 2025).

**RESPONSE:** Defendants admit that the Sunday Agreement was not amended. The remaining allegations in this paragraph constitute conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations.

41. System1 diligently followed up with Sunday, and the Cozzolinos specifically, on numerous occasions between March and September 2025 about the status of its account migration. Most of the correspondence between Sunday and System1 occurred via Slack chats, between and among Mark Huerta (President, Publishing & Syndication, System1), Matthew Bren (GM, Syndication, System1), Paul Cozzolino (CEO, Sunday), and Breanne Cozzolino (COO, Sunday), certain of which are excerpted here:

| Timestamp | Sender | Message |
|---|---|---|
| 3/3/2025 22:30 | Mark Huerta | do you have a timeline on migrating your traffic out of the SM account? |
| 3/4/2025 18:48 | Mark Huerta | did you receive the invoice? also any update on timing of migrating your traffic? |
| 3/4/2025 18:49 | Paul Cozzolino | we need to wait for 2 more domains to get approved in the third account before we can swap |
| 3/10/2025 18:40 | Matthew Bren | any update on how things are going on transitioning your internal buys to the other accounts? |
| 3/11/2025 17:23 | Matthew Bren | wanted to check in again about the transition as well. How are things progressing? |
| 3/12/2025 16:48 | Mark Huerta | checking in - how is it going? do you have a timeline for your migration out of the sunday market account? our team is going to need more channels soon, lmk if any can free up asap |
| 3/12/2025 16:52 | Paul Cozzolino | yes so the issue is we have 2 other accounts BUT we only have 1 domain live in each |
| 3/12/2025 16:53 | Paul Cozzolino | and that is not enough to supplement and transistion off of our ad sense |
| 3/12/2025 16:53 | Paul Cozzolino | i thought it would of been a lot faster but we ran into a few unforseen disappravls |
| 3/12/2025 16:54 | Breanne Storey | This is also why I sent the email about banking yesterday. We aren't comfortable changing banking till all our traffic is off. Are you okay adding that to the contract addendum? |
| 3/12/2025 17:41 | Mark Huerta | just so I'm clear, once you have removed your traffic from the sunday market account, you're okay with replacing the existing backing with a financial intermediary account designated by system1? |
| 3/12/2025 17:41 | Mark Huerta | you just need more time? |
| 3/12/2025 17:50 | Breanne Storey | Yes exactly |
| 3/12/2025 17:51 | Breanne Storey | Once the other two accounts are up and running smoothly, and all our traffic has been transitioned off the SM account we're happy to transfer the bank info to a joint escrow |
| 3/12/2025 17:57 | Mark Huerta | once you have no activity in the account, any reason not to just move it a fully owned bank account by someone we designate? why do we need joint at that point? we can wire you your minimum per domain payment or % revshare |

| | | |
|---|---|---|
| 3/12/2025 17:57 | Mark Huerta | any reason you don't move <http://travelroo.com\|travelroo.com> or <http://factfeed.com\|factfeed.com> to your other accounts? we aren't using those, and they aren't in our contract with you |
| 3/12/2025 18:01 | Breanne Storey | The concern is we have pretty much sold you the account at that point and if we decide to end the contract at any point we do not have any control over future payments. And since we still own the account we need to maintain payment ownership as well. |
| 3/12/2025 18:12 | Paul Cozzolino | heh |
| 3/12/2025 18:13 | Paul Cozzolino | i am very scared moving those |
| 3/12/2025 18:13 | Paul Cozzolino | thats what we are using currently |
| 3/12/2025 18:13 | Paul Cozzolino | i need to go to new york and have a chat with these people is what i need to do |
| 3/12/2025 18:18 | Mark Huerta | understood |
| 3/12/2025 18:19 | Mark Huerta | I'm fine waiting to move that payment until you get the traffic off the feed, I'm assuming you'll still be able to do that this month? |
| 3/12/2025 18:19 | Mark Huerta | no need for additional contract work imo, i just won't enforce it |
| 3/12/2025 18:20 | Mark Huerta | ok, we move sites all the time. it shouldn't really be a problem if you pause traffic for a few days and migrate |
| 3/12/2025 18:22 | Paul Cozzolino | definintely not in two weeks we still only have 1 domain in each account i need to get alteast 2 in each |
| 3/12/2025 18:22 | Paul Cozzolino | we have a bunch submitted but you know how it goes |
| 3/12/2025 18:24 | Paul Cozzolino | you move sites all the time from adsense account to a brand new adsense account?? |
| 3/12/2025 18:24 | Mark Huerta | we have done that before yes |
| 3/12/2025 18:24 | Mark Huerta | selling sites between entities |
| 3/12/2025 18:24 | Paul Cozzolino | :cold_sweat: ok... i can try let me ask first |

| | | |
|---|---|---|
| 3/12/2025 18:25 | Mark Huerta | (this is not legal advice) |
| 3/12/2025 18:26 | Paul Cozzolino | hahah |
| 3/12/2025 18:27 | Paul Cozzolino | mark from system1 said |
| 3/12/2025 18:32 | Mark Huerta | no way |
| 3/14/2025 19:26 | Mark Huerta | just confirming - we don't need any update to the contract correct? |
| 3/14/2025 19:26 | Mark Huerta | We'll move to a joint account soon? |
| 3/14/2025 19:43 | Breanne Storey | I'd like to update the addendum |
| 3/14/2025 19:44 | Breanne Storey | Just for legality as the other says in a few weeks we have to move and we aren't there yet |
| 3/14/2025 19:44 | Breanne Storey | with moving traffic off |
| 3/14/2025 20:05 | Mark Huerta | ok can you suggest redlines and I'll get it to our legal team? |
| 3/14/2025 20:40 | Breanne Storey | Sure |
| 4/30/2025 15:44 | Mark Huerta | Hey checking in – how's the site/account migration going? Any update on the channel increase on the SM account? |
| 8/7/2025 18:39 | Matthew Bren | im looking at the account and seeing a good amount of revenue that isn't using our styling |
| 8/7/2025 18:40 | Matthew Bren | like almost $700K in the last 30 days |
| 8/7/2025 18:40 | Matthew Bren | is this correct? |
| 8/7/2025 21:24 | Paul Cozzolino | You mean the new policies? |

| | | |
|---|---|---|
| 8/7/2025 21:24 | Matthew Bren | yes |
| 8/7/2025 21:24 | Matthew Bren | the ones rolling out on 8/25 |
| 8/7/2025 21:25 | Matthew Bren | are you available for a call tomorrow? |
| 8/7/2025 21:25 | Matthew Bren | want to make sure we're on the same page about whats coming and how we need to coordinate |
| 8/7/2025 21:26 | Paul Cozzolino | Yes i mean it doesn't seem like any changes we need to do though? |
| 8/7/2025 21:26 | Matthew Bren | also, i was under the impression that you guys were winding down your buys on the sites we share, am i right to see that they've scaled up a bunch? |
| 8/7/2025 21:26 | Paul Cozzolino | It's just sounds like it's a new barrier to entry and the strike system for fraud |
| 8/7/2025 21:27 | Matthew Bren | there is a bigger barrier for entry, but yes, the strike system |
| 8/7/2025 21:27 | Matthew Bren | but given the amount of revenue, the risks got a lot bigger |
| 8/7/2025 21:28 | Matthew Bren | have you guys ramped your buys? |
| 8/7/2025 21:29 | Paul Cozzolino | yes we have 3 other adsense accounts and we weren't suppose to launch more on that sunday market account but it seems i didn't make myself clear to the buyers |
| 8/7/2025 21:29 | Paul Cozzolino | yah we're doing big numbers with it |
| 8/7/2025 21:29 | Paul Cozzolino | I'll make sure to have them move everything off |
| 8/7/2025 21:29 | Matthew Bren | ok great |

**<u>RESPONSE</u>:** Defendants admit that representatives of System1 and Sunday Market corresponded on multiple occasions between March and September 2025 and that the Slack messages set forth in this paragraph entail part of that correspondence. That correspondence speaks for itself and

Defendants refer to that correspondence for its full and complete content, and deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this paragraph.

42. At no point between the parties' agreement to defer the Joint Escrow Account requirement and the time that Sunday breached the Sunday Agreement by not remitting System1's share of Google AFS search revenue, did Sunday ever complete migrating to a separate account its direct search traffic from the Sunday Google AFS Account. Sunday's failure to do so prevented the establishment of the Joint Escrow Account, thereby intentionally depriving System1 of the ability to access its 99% share of the Google AFS search revenue that it generated.

**RESPONSE:** Defendants agree that Sunday Market did not complete migrating to a separate account its direct search traffic from Sunday Market's Google AFS Account. The remaining allegations in this paragraph constitute subjective or opinion-based statements which are not susceptible of admission or denial, and conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations.

43. In reliance on Sunday's numerous misrepresentations beginning in March 2025 (as set forth more fully above) that it would diligently work to migrate its direct search traffic and establish the Joint Escrow Account by mid-summer, and considering Sunday's prior threat of contract termination based on low Google AFS search revenue, System1 scaled Sunday's Google AFS search revenue month-over-month. System1 ultimately generated millions of dollars in Google AFS search revenue and almost $350,000 for Sunday through its 1% revenue share rate. This, despite limited work for the Sunday team and without Sunday having to incur any direct Out-of-Pocket Expenses on traffic acquisition costs for such Google AFS search revenue.

**<u>RESPONSE</u>:** Defendants admit that System1 increased Sunday Market's Google AFS search revenue month-over-month, and ultimately generated millions of dollars in total Google AFS search revenue. The remaining allegations in this paragraph constitute subjective or opinion-based statements which are not susceptible of admission or denial, and conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations.

44. However, for its part, and to scale the Google AFS revenue, System1 necessarily incurred significant Out-of-Pocket Expenses for the benefit of Sunday. But System1 did not receive any contractual payments for the Services it performed for Sunday under the Sunday Agreement between October 2025 and January 2026. Given the nature of the Services that System1 performed for Sunday under the Sunday Agreement, System1's Out-of-Pocket Expenses closely correlate to but are distinct from the System1 and Sunday Retained Revenue (*i.e.* the relatively thin ~10-15% margin referenced above).

**<u>RESPONSE</u>:** Defendant admits that System1 did not receive any contractual payments from Sunday Market for Services performed between October 2025 and January 2026. The remaining allegations in this paragraph constitute subjective or opinion-based statements which are not susceptible of admission or denial, and conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations.

45. System1 undertook these efforts, including incurring such significant Out-of-Pocket Expenses, in reliance on Sunday's representations in its CEO's and COO's written correspondence to and verbal discussions with, representatives of System1 that it would agree to establish the required Joint Escrow Account after promptly migrating its own direct traffic to a

separate Google AFS account, and otherwise on Sunday's contractual obligations to timely pay the System1 invoices in accordance with the Sunday Agreement.

**RESPONSE:** Defendants admit that the parties corresponded with each other regarding the Joint Escrow Account. That correspondence speaks for itself and Defendants refer to that correspondence for its full and complete content, and deny any allegations inconsistent therewith. The remaining allegations in this paragraph constitute subjective or opinion-based statements which are not susceptible of admission or denial, and conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations.

C. System1 Successfully Scales Sunday Revenues

46. Beginning on February 25, 2025, System1 sent Sunday an invoice dated January 30, 2025, for the fees associated with the Services it performed for Sunday in connection with the Sunday Agreement during the month of December 2024, in the amount of $5,711.42.

**RESPONSE:** Defendants admit that on or about February 25, 2025, System1 sent Sunday Market an invoice concerning Services in connection with the Sunday Agreement during December 2024. That document speaks for itself and Defendants refer to that document for its full and complete content, and deny any allegations inconsistent therewith.

47. Also on February 25, 2025, System1 sent Sunday an invoice dated January 31, 2025, for the fees associated with the Services it performed for Sunday in connection with the Sunday Agreement during the month of January 2025, in the amount of $169,896.94.

**RESPONSE:** Defendants admit that on or about February 25, 2025, System1 sent Sunday Market an invoice concerning Services in connection with the Sunday Agreement during January 2025.

That document speaks for itself and Defendants refer to that document for its full and complete content, and deny any allegations inconsistent therewith.

48. On February 26, 2025, and after its verified receipt of the Google Monthly Payment, Sunday wired System1 payment for the fees associated with the Services for the months of December 2024, and January 2025, respectively, combined in the total amount of $175,608.36.

**RESPONSE:** Admitted.

49. On March 3, 2025, System1 sent Sunday an invoice dated February 28, 2025, for the fees associated with the Services it performed for Sunday in connection with the Sunday Agreement for the month of February 2025, in the amount of $749,673.83. On March 24, 2025, and after its verified receipt of the Google Monthly Payment, Sunday wired System1 payment for the fees associated with the Services in the amount of $749,673.83.

**RESPONSE:** Defendants admit that on or about March 3, 2025, System1 sent Sunday Market an invoice concerning Services in connection with the Sunday Agreement during February 2025. That document speaks for itself and Defendants refer to that document for its full and complete content, and deny any allegations inconsistent therewith. Defendants admit that on or about March 24, 2025, Sunday Market wired System1 payment in the amount of $749,673.83.

50. On April 2, 2025, System1 sent Sunday an invoice dated March 31, 2025, for the fees associated with the Services it performed for Sunday in connection with the Sunday Agreement for the month of March 2025, in the amount of $2,101,425.59—representing a nearly 300% increase in revenue month-over-month. On April 22, 2025, and after its verified receipt of

the Google Monthly Payment, Sunday wired System1 payment for the fees associated with the Services in the amount of $2,101,425.59.

**RESPONSE:** Defendants admit that on or about April 2, 2025, System1 sent Sunday Market an invoice concerning Services in connection with the Sunday Agreement during March 2025. That document speaks for itself and Defendants refer to that document for its full and complete content, and deny any allegations inconsistent therewith. Defendants admit that on or about April 22, 2025, Sunday Market wired System1 payment in the amount of $2,101,425.59.

51. On April 23, 2025, Ms. Cozzolino, on Sunday's behalf, wrote to System1 to "share a quick summary of the Q1 2025 chargebacks," which reflected minimal advertiser credit chargebacks as a percentage of total Search Revenue generated of only 0.79%, 0.64%, and 0.36% for the months of January through March, respectively. Sunday concluded: "We're very appreciative of the strong growth this quarter—especially the significant ramp in March volume. Thank you for your continued trust and collaboration."

**RESPONSE:** Defendants admit that on April 23, 2025, Mrs. Cozzolino corresponded with System1. That correspondence speaks for itself and Defendants refer to that correspondence for its full and complete content, and deny any allegations inconsistent therewith.

52. On or about April 30, 2025, System1 sent Sunday an invoice dated April 30, 2025, for the fees associated with the Services it performed for Sunday in connection with the Sunday Agreement for the month of April 2025, in the amount of $1,956,018.17. On May 27, 2025, and after its verified receipt of the Google Monthly Payment, and resolving a small billing discrepancy in good faith, Sunday wired System1 payment for the fees associated with the Services in the amount of $1,955,998.17.

**<u>RESPONSE</u>:** Defendants admit that on or about April 30, 2025, System1 sent Sunday Market an invoice concerning Services in connection with the Sunday Agreement during April 2025. That document speaks for itself and Defendants refer to that document for its full and complete content, and deny any allegations inconsistent therewith. Defendants admit that on or about May 27, 2025, Sunday Market wired System1 payment in the amount of $1,955,998.17.

53. On June 12, 2025, System1 sent Sunday an invoice dated May 31, 2025, for the fees associated with the Services it performed for Sunday in connection with the Sunday Agreement for the month of May 2025, in the amount of $2,166,172.65. On June 25, 2025, and after its verified receipt of the Google Monthly Payment, and resolving a small billing discrepancy in good faith, Sunday wired System1 payment for the fees associated with the Services in the amount of $2,155,552.08.

**<u>RESPONSE</u>:** Defendants admit that on or about June 12, 2025, System1 sent Sunday Market an invoice concerning Services in connection with the Sunday Agreement during May 2025. That document speaks for itself and Defendants refer to that document for its full and complete content, and deny any allegations inconsistent therewith. Defendants admit that on or about June 25, 2025, Sunday Market wired System1 payment in the amount of $2,155,552.08.

54. On July 11, 2025, System1 sent Sunday an invoice dated June 30, 2025, for the fees associated with the Services it performed for Sunday in connection with the Sunday Agreement for the month of June 2025, in the amount of $2,834,268.21—representing another roughly 25% increase in revenue month-over-month. On July 22, 2025, and after its verified receipt of the Google Monthly Payment, Sunday wired System1 payment for the fees associated with the Services in the amount of $2,834,268.21.

**RESPONSE:** Defendants admit that on or about July 11, 2025, System1 sent Sunday Market an invoice concerning Services in connection with the Sunday Agreement during June 2025. That document speaks for itself and Defendants refer to that document for its full and complete content, and deny any allegations inconsistent therewith. Defendants admit that on or about July 22, 2025, Sunday Market wired System1 payment in the amount of $2,834,268.21.

55. On August 25, 2025, System1 sent Sunday an invoice dated July 31, 2025, for the fees associated with the Services it performed for Sunday in connection with the Sunday Agreement for the month of July 2025, in the amount of $2,919,301.75. On August 25, 2025, and after its verified receipt of the Google Monthly Payment, Sunday wired System1 payment for the fees associated with the Services in the amount of $2,919,301.75.

**RESPONSE:** Defendants admit that on or about July 31, 2025, System1 sent Sunday Market an invoice concerning Services in connection with the Sunday Agreement during July 2025. That document speaks for itself and Defendants refer to that document for its full and complete content, and deny any allegations inconsistent therewith. Defendants admit that on or about August 25, 2025, Sunday Market wired System1 payment in the amount of $2,919,301.75.

56. On September 29, 2025, System1 sent Sunday an invoice dated August 31, 2025, for the fees associated with the Services it performed for Sunday in connection with the Sunday Agreement for the month of August 2025, in the amount of $2,968,636.36. On October 2, 2025, and after its verified receipt of the Google Monthly Payment, Sunday wired System1 payment for the fees associated with the Services in the amount of $2,968,636.36.

**RESPONSE:** Defendants admit that on or about September 29, 2025, System1 sent Sunday Market an invoice concerning Services in connection with the Sunday Agreement during August

2025. That document speaks for itself and Defendants refer to that document for its full and complete content, and deny any allegations inconsistent therewith. Defendants admit that on or about October 2, 2025, Sunday Market wired System1 payment in the amount of $2,968,636.36.

57. On October 7, 2025, System1 sent Sunday an invoice dated September 30, 2025, for the fees associated with the Services it performed for Sunday in connection with the Sunday Agreement for the month of September 2025, in the amount of $4,221,689.92. On October 22, 2025, and after its verified receipt of the Google Monthly Payment, Sunday wired System1 payment for the fees associated with the Services in the amount of $4,221,689.92.

**RESPONSE:** Defendants admit that on or about September 30, 2025, System1 sent Sunday Market an invoice concerning Services in connection with the Sunday Agreement during September 2025. That document speaks for itself and Defendants refer to that document for its full and complete content, and deny any allegations inconsistent therewith. Defendants admit that on or about October 22, 2025, Sunday Market wired System1 payment in the amount of $4,221,689.92.

D. Sunday Breaches Its Payment Obligations

58. On or about October 31, 2025, System1 sent Sunday an invoice for the fees associated with the Services it performed for Sunday in connection with the Sunday Agreement for the month of October 2025, in the amount of $3,576,716.39. As with all prior invoices issued by System1 to Sunday, the terms of the October 2025 invoice were no later than Net30 from the end of the prior calendar month, but with payment by wire transfer due within three (3) business days of its receipt of the Google Monthly Payment for October (which Sunday actually received

on or about November 21, 2025), and in no event later than November 30, 2025. To date, System1 has not been paid for the Services it performed for Sunday in October 2025.

**RESPONSE:** Defendants admit that on or about October 31, 2025, System1 sent Sunday Market an invoice concerning Services in connection with the Sunday Agreement during October 2025. That document speaks for itself and Defendants refer to that document for its full and complete content, and deny any allegations inconsistent therewith. Defendants admit the remaining allegations in this paragraph.

59. On or about November 30, 2025, System1 sent Sunday an invoice for the fees associated with the Services it performed for Sunday in connection with the Sunday Agreement for the month of November 2025, in the amount of $3,735,694.22. The November 2025 invoice likewise was no later than Net30 but actually due and payable by wire transfer within three (3) business days of its receipt of the Google Monthly Payment for November (which Sunday actually received on or about December 22, 2025), but in no event no later than December 30, 2025. To date, System1 has not been paid for the Services it performed for Sunday in November 2025.

**RESPONSE:** Defendants admit that on or about November 30, 2025, System1 sent Sunday Market an invoice concerning Services in connection with the Sunday Agreement during November 2025. That document speaks for itself and Defendants refer to that document for its full and complete content, and deny any allegations inconsistent therewith. Defendants admit the remaining allegations in this paragraph.

60. On or about December 31, 2025, System1 sent Sunday an invoice for the fees associated with the Services it performed for Sunday in connection with the Sunday Agreement

for the month of December 2025, in the amount of $193,586.83. To date, System1 has not been paid for the Services it performed for Sunday in December 2025.

**<u>RESPONSE</u>:** Defendants admit that on or about December 31, 2025, System1 sent Sunday Market an invoice concerning Services in connection with the Sunday Agreement during December 2025. That document speaks for itself and Defendants refer to that document for its full and complete content, and deny any allegations inconsistent therewith. Defendants admit the remaining allegations in this paragraph.

E. <u>Sunday Breaches AFS Account Access Provision</u>

61. Pursuant to Section 2(c) of the Sunday Agreement, Sunday contractually agreed to provide System1 with access to its Google AFS account related to for the Company Websites/Subdomains for which System1 provided Services. The Company Websites (and corresponding Subdomains) included the seven (7) websites listed in Schedule 2 of the Sunday Agreement.

**<u>RESPONSE</u>:** The allegations in this paragraph purport to characterize the terms of the Sunday Agreement. The Sunday Agreement speaks for itself, and Defendants refer to the document for its full and complete terms and deny the allegations in this paragraph to the extent inconsistent therewith.

62. Sunday complied with Section 2(c) of the Sunday Agreement and provided System1 with access to the Google AFS account on or about October 15, 2024. However, upon information and belief, on or about January 19, 2026, Sunday unilaterally—and without warning or notice to System1—revoked System1's Google AFS account access. System1 has been unable to access Sunday's Google AFS account since. System1 cannot provide the Services to Sunday

under the Sunday Agreement without access to the AFS account. Nor can System1 properly track Search Revenue and invoice Sunday as is contractually required by the Sunday Agreement, absent Google AFS account access.

**RESPONSE:** Defendants admit that on or about January 19, 2026, Sunday Market revoked System1's Google AFS account access. The remaining allegations in this paragraph constitute subjective or opinion-based statements which are not susceptible of admission or denial, and conclusions of law, to which no response is required. To the extent a response is required, Defendants deny the allegations.

63. System1 sent Sunday a letter addressed to Mr. Cozzolino dated January 21, 2026, demanding immediate payment of the October and November invoices (as the invoice for the month of December 2025 was not yet then past due), and noting Sunday's breaches of the Sunday Agreement, including its unilateral revocation of System1's access to the Google AFS accounts (the "Demand Letter"). The Demand Letter also notified Sunday of the potential for litigation and its document preservation obligations in connection with same. On Friday January 30, 2026, counsel to Sunday finally responded to System1's Demand Letter with correspondence filled with unfounded allegations and significant falsehoods.

**RESPONSE:** Defendants admit that, on or about January 21, 2026, System1 sent a letter addressed to Cozzolino, and on or about January 30, 2026, counsel for Defendants sent System1 a responsive letter. That correspondence speaks for itself and Defendants refer to that correspondence for its full and complete content, and deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this paragraph.

F. Ring of Media Agreement

64. Given the commercial success of the partnership between System1 and Sunday under the Sunday Agreement as recently as mid-October 2025, Sunday and System1 renewed discussions regarding the prospect of System1 providing the same Services for another company, Ring of Media LLC ("Ring"), which is owned and managed by Mr. Cozzolino. Ring also maintained its own, separate Google AFS account through which System1 was to provide Services and from which System1 and Ring would derive Search Revenue.

**RESPONSE:** Defendants admit that Cozzolino owns an interest in, and is a manager of, Ring; that Ring maintained a separate Google AFS account; and that Sunday Market and System1 engaged in discussions regarding the prospect of System1 providing services for Ring. The remaining allegations in this paragraph constitute subjective or opinion-based statements which are not susceptible of admission or denial. To the extent a response is required, Defendants deny the allegations.

65. On or about October 30, 2025, Ring and System1 entered that certain Services Agreement, inclusive of the Standard Terms and Conditions and the Company Websites, annexed thereto as Schedules 1 and 2, respectively (the "Ring Agreement").

**RESPONSE:** Defendants admit that on or about October 30, 2025, Ring and System1 entered into the Ring Agreement. The Ring Agreement speaks for itself, and Defendants refer to the document for its full and complete terms and deny the allegations in this paragraph to the extent inconsistent therewith.

66. The Ring Agreement contains a one-year Initial Term ending October 30, 2026. The Ring Agreement currently remains in full force and effect.

**<u>RESPONSE</u>:** The allegations in this paragraph purport to characterize the terms of the Ring Agreement. The Ring Agreement speaks for itself, and Defendants refer to the document for its full and complete terms and deny the allegations in this paragraph to the extent inconsistent therewith.

67. In all substantive respects, the Ring Agreement is identical to the Sunday Agreement, including the Services offered, the payment provisions, and Google AFS account access provisions.

**<u>RESPONSE</u>:** The allegations in this paragraph purport to characterize the terms of the Ring Agreement. The Ring Agreement speaks for itself, and Defendants refer to the document for its full and complete terms and deny the allegations in this paragraph to the extent inconsistent therewith.

G. <u>Ring of Media Breaches Its Payment Obligations</u>

68. On or about January 18, 2026, System1 sent Ring an invoice dated November 30, 2025, for the fees associated with the Services it performed for Ring in connection with the Ring Agreement for the month of November 2025, in the amount of $26,427.38. As with the invoices issued by System1 to Sunday, the terms of the November 2025 invoice were Net30, with payment by wire transfer due no later than December 30, 2025. To date, System1 has not been paid for the Services it performed for Ring in November 2025.

**<u>RESPONSE</u>:** Defendants admit that, on or about January 18, 2026, System1 sent Ring an invoice concerning Services in connection with the Ring Agreement during November 2025. That document speaks for itself and Defendants refer to that document for its full and complete content, and deny any allegations inconsistent therewith. To the extent the allegations in this paragraph

purport to characterize the terms of the Ring Agreement, the Ring Agreement speaks for itself and Defendants refer to the document for its full and complete terms and deny the allegations in this paragraph to the extent inconsistent therewith. Defendants admit the remaining allegations in this paragraph.

69. On or about January 18, 2026, System1 sent Ring an invoice dated December 31, 2025, for the fees associated with the Services it performed for Ring in connection with the Ring Agreement for the month of December 2025, in the amount of $21,218.77. As with the November 2025 Ring invoice, the terms of the December 2025 invoice were Net30, with payment by wire transfer due no later than January 30, 2026. To date, System1 has not been paid for the Services it performed for Ring in December 2025.

**RESPONSE:** Defendants admit that, on or about January 18, 2026, System1 sent Ring an invoice concerning Services in connection with the Ring Agreement during December 2025. That document speaks for itself and Defendants refer to that document for its full and complete content, and deny any allegations inconsistent therewith. To the extent the allegations in this paragraph purport to characterize the terms of the Ring Agreement, the Ring Agreement speaks for itself and Defendants refer to the document for its full and complete terms and deny the allegations in this paragraph to the extent inconsistent therewith. Defendants admit the remaining allegations in this paragraph.

H. Ring of Media Breaches AFS Account Access Provision

70. Pursuant to Section 2(c) of the Ring Agreement, Ring had agreed to provide System1 with access to the company's Google AFS account related to Ring's Company

Website/Subdomains for which System1 provided Services. The Company Websites (and corresponding Subdomains) included those listed in Schedule 2 of the Ring Agreement.

**RESPONSE:** The allegations in this paragraph purport to characterize the terms of the Ring Agreement. The Ring Agreement speaks for itself, and Defendants refer to the document for its full and complete terms and deny the allegations in this paragraph to the extent inconsistent therewith.

71. Ring complied with Section 2(c) of the Ring Agreement and provided System1 with access to the AFS account on or about October 30, 2025. However, upon information and belief, on or about January 18, 2026, Ring unilaterally—and without warning or notice to System1—similarly revoked System1's Google AFS account access. System1 has been unable to access Ring's AFS account since. System1 cannot provide the Services to Ring under the Ring Agreement without access to the AFS account. Nor can System1 properly track Search Revenue and invoice Ring as is contractually required by the Ring Agreement, absent the Google AFS account access.

**RESPONSE:** Defendants admit that on or about January 18, 2026, Ring revoked System1's Google AFS account access. The remaining allegations in this paragraph constitute subjective or opinion-based statements which are not susceptible of admission or denial, and conclusions of law, to which no response is required. To the extent a response is required, Defendants deny the allegations.

**FIRST CLAIM FOR RELIEF**
**(Breach of Contract as Against Sunday - Payments)**

72. System1 repeats and realleges the allegations contained in Paragraphs 1 through 71, as if fully set forth herein.

**<u>RESPONSE</u>:** The allegations in this paragraph constitute conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in this paragraph.

73. The Sunday Agreement is an existing, valid and enforceable contract.

**<u>RESPONSE</u>:** Admitted.

74. System1 has performed all conditions, covenants and promises that it was required to perform under the Sunday Agreement.

**<u>RESPONSE</u>:** Defendants deny the allegations in this paragraph.

75. Sunday breached the Sunday Agreement by failing to pay System1 its invoices for Services it performed for Sunday for the months of October, November, and December 2025, in accordance with the Sunday Agreement.

**<u>RESPONSE</u>:** Defendants admit that Sunday Market has not paid System1 the invoices referenced in this paragraph. The remaining allegations in this paragraph constitute conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in this paragraph.

76. As a result of Sunday's failure to pay System1 for Services rendered pursuant to the Sunday Agreement, System1 has suffered damages in an amount not less than $7,505,997.44, exclusive of interest, fees, and costs, all to be determined at trial.

**<u>RESPONSE</u>:** The allegations in this paragraph constitute conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in this paragraph, and deny that Plaintiff is entitled to any of the relief requested.

**SECOND CLAIM FOR RELIEF**
**(Breach of Contract as Against Ring of Media – Payments)**

77. System1 repeats and realleges the allegations contained in Paragraphs 1 through 76 as if fully set forth herein.

**RESPONSE:** The allegations in this paragraph constitute conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in this paragraph.

78. The Ring Agreement is an existing, valid and enforceable contract.

**RESPONSE:** Admitted.

79. System1 has performed all conditions, covenants and promises that it was required to perform under the Ring Agreement.

**RESPONSE:** Defendants deny the allegations in this paragraph.

80. Ring breached the Ring Agreement by failing to pay System1 its invoices for Services it performed for Ring for the months of November and December 2025, in accordance with the Ring Agreement.

**RESPONSE:** Defendants admit that Ring has not paid System1 the invoices referenced in this paragraph. The remaining allegations in this paragraph constitute conclusions of law to which no response is required. To the extent a response is required, Defendants deny the remaining allegations in this paragraph.

81. As a result of Ring's failure to pay System1 for Services rendered pursuant to the Ring Agreement, System1 has suffered damages in an amount not less than $47,646.15, exclusive of interest, fees, and costs all to be determined at trial.

**RESPONSE:** The allegations in this paragraph constitute conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in this paragraph, and deny that Plaintiff is entitled to any of the relief requested.

**THIRD CLAIM FOR RELIEF**
**(Breach of Contract as Against Sunday – Google AFS Account Access)**

82. System1 repeats and realleges the allegations contained in Paragraphs 1 through 81, as if fully set forth herein.

**RESPONSE:** The allegations in this paragraph constitute conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in this paragraph.

83. The Sunday Agreement is an existing, valid and enforceable contract.

**RESPONSE:** Admitted.

84. System1 has performed all conditions, covenants and promises that it was required to perform under the Sunday Agreement.

**RESPONSE:** Defendants deny the allegations in this paragraph.

85. Sunday breached the Sunday Agreement by unilaterally revoking System1's access to its Google AFS accounts as required by and in accordance with the Sunday Agreement.

**RESPONSE:** Defendants admit that Sunday Market revoked System1's access to its Google AFS accounts. The remaining allegations in this paragraph constitute conclusions of law to which no response is required. To the extent a response is required, Defendants deny the remaining allegations in this paragraph.

86. As a result of Sunday's revocation of the Google AFS account access, System1 has suffered damages in an amount that cannot presently be calculated but to be determined at trial.

**RESPONSE:** The allegations in this paragraph constitute conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in this paragraph, and deny that Plaintiff is entitled to any of the relief requested.

## FOURTH CLAIM FOR RELIEF
## (Breach of Contract as Against Ring – Google AFS Account Access)

87. System1 repeats and realleges the allegations contained in Paragraphs 1 through 86, as if fully set forth herein.

**RESPONSE:** The allegations in this paragraph constitute conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in this paragraph.

88. The Ring Agreement is an existing, valid and enforceable contract.

**RESPONSE:** Admitted.

89. System1 has performed all conditions, covenants and promises that it was required to perform under the Ring Agreement.

**RESPONSE:** Defendants deny the allegations in this paragraph.

90. Ring breached the Ring Agreement by unilaterally revoking System1's access to its Google AFS accounts as required by and in accordance with the Ring Agreement.

**RESPONSE:** Defendants admit that Ring revoked System1's access to its Google AFS accounts. The remaining allegations in this paragraph constitute conclusions of law to which no response is

required. To the extent a response is required, Defendants deny the remaining allegations in this paragraph.

91. As a result of Ring's revocation of the Google AFS account access, System1 has suffered damages in an amount that cannot presently be calculated but to be determined at trial.

**RESPONSE:** The allegations in this paragraph constitute conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in this paragraph, and deny that Plaintiff is entitled to any of the relief requested.

**FIFTH CLAIM FOR RELIEF**
**(In the Alternative, Breach of Implied Duty of Good Faith and Fair Dealing as Against Sunday)**

92. System1 repeats and realleges the allegations contained in Paragraphs 1 through 91, as if fully set forth herein.

**RESPONSE:** The allegations in this paragraph constitute conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in this paragraph.

93. On October 15, 2024, System1 and Sunday entered into the Sunday Agreement, a valid, enforceable, and binding contract.

**RESPONSE:** Admitted.

94. For System1 to provide the Services more fully set forth in the Sunday Agreement, Sunday agreed to provide System1 access to its Google AFS accounts. Sunday knew or had reason to know that System1 could not perform the Services without access to the Google AFS accounts.

**RESPONSE:** Admitted.

95. In exchange for System1 providing the Services more fully set forth in the Sunday Agreement, Sunday also agreed to pay System1 pursuant to the payment provisions in the Sunday Agreement, including, but not limited to, Section 3 of the Services Agreement, and Sections 2(d) and 8(a) of Schedule 1, the Standard Terms and Conditions.

**RESPONSE:** The allegations in this paragraph constitute conclusions of law to which no response is required, and purport to describe the terms of the Sunday Agreement. To the extent a response is required, the Sunday Agreement speaks for itself, and Defendants refer to the document for its full and complete terms and deny the allegations in this paragraph to the extent inconsistent therewith.

96. System 1 has performed all its obligations under the Sunday Agreement.

**RESPONSE:** Defendants deny the allegations in this paragraph.

97. System1 reasonably understood that the Sunday Agreement imposed on Sunday an implied duty of good faith and fair dealing to provide System1 with access to Sunday's Google AFS accounts, and to promptly pay System1 in exchange for the Services it provided to Sunday on a rolling monthly basis (within three (3) business days of its receipt of the Google Monthly Payment but in no event on less than Net30 terms) and in accordance with the payment terms more fully set forth therein.

**RESPONSE:** The allegations in this paragraph constitute conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in this paragraph.

98. On or about November 30, 2025, Sunday breached the implied duty of good faith and fair dealing by withholding from System1 the benefits to which it was entitled (namely,

payment) under the Sunday Agreement for the Services that System1 provided to Sunday during the preceding calendar month. Specifically, instead of sending System1 a wire payment upon receipt from Google of its Google Monthly Payment for the month of October, Sunday retained the entire Google Monthly Payment and not just the Company's Retained Revenue (as contemplated by the express terms of the Sunday Agreement) for its own personal gain at System1's expense.

**RESPONSE:** Defendants admit that Sunday Market has not paid System1 the Google Monthly Payment relating to Services provided during October 2025. The remaining allegations in this paragraph constitute subjective or opinion-based statements which are not susceptible of admission or denial, and conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations.

99. On or about December 30, 2025, Sunday breached the duty of good faith and fair dealing by again withholding from System1 the benefits to which it was entitled (namely, payment) under the Sunday Agreement for the Services that System1 provided to Sunday during the preceding calendar month. Specifically, instead of sending System1 a wire payment upon receipt from Google of its Google Monthly Payment for the month of November, Sunday retained the entire Google Monthly Payment and not just the Company's Retained Revenue (as contemplated by the express terms of the Sunday Agreement) for its own personal gain at System1's expense.

**RESPONSE:** Defendants admit that Sunday Market has not paid System1 the Google Monthly Payment relating to Services provided during November 2025. The remaining allegations in this paragraph constitute subjective or opinion-based statements which are not susceptible of admission or denial, and conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations.

100. On or about January 30, 2026, Sunday breached the duty of good faith and fair dealing by again withholding from System1 the benefits to which it was entitled (namely, payment) under the Sunday Agreement for the Services that System1 provided to Sunday during the preceding calendar month. Specifically, instead of sending System1 a wire payment upon receipt from Google of its Google Monthly Payment for the month of December, Sunday retained the entire Google Monthly Payment and not just the Company's Retained Revenue (as contemplated by the express terms of the Sunday Agreement) for its own personal gain at System1's expense.

**RESPONSE:** Defendants admit that Sunday Market has not paid System1 the Google Monthly Payment relating to Services provided during December 2025. The remaining allegations in this paragraph constitute subjective or opinion-based statements which are not susceptible of admission or denial, and conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations.

101. Instead of working with System1 in good faith towards satisfying its obligations, Sunday stonewalled System1's attempts obtain the benefits of the bargain it struck with Sunday.

**RESPONSE:** The allegations in this paragraph constitute subjective or opinion-based statements which are not susceptible of admission or denial, and conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations.

102. Sunday also unilaterally revoked AFS account access to which System1 was entitled and on which System1 necessarily relies in order to provide the Services under the Sunday Agreement.

**RESPONSE:** Defendants admit that Sunday Market revoked System1's AFS account access. The remaining allegations in this paragraph constitute subjective or opinion-based statements which are not susceptible of admission or denial, and conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations.

103. As a result of Sunday's breaches, System1 has suffered damages in an amount not less than $7,505,997.44, exclusive of interest, fees, and costs all to be determined at trial.

**RESPONSE:** The allegations in this paragraph constitute conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in this paragraph, and deny that Plaintiff is entitled to any of the relief requested.

104. The damages flow directly from and are the natural and probable consequence of Sunday's breaches.

**RESPONSE:** The allegations in this paragraph constitute conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations.

**SIXTH CLAIM FOR RELIEF**
**(In the Alternative, Breach of Implied Duty of Good Faith and Fair Dealing as Against Ring of Media)**

105. System1 repeats and realleges the allegations contained in Paragraphs 1 through 104, as if fully set forth herein.

**RESPONSE:** The allegations in this paragraph constitute conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in this paragraph.

106. On October 30, 2025, System1 and Ring entered into the Ring Agreement, a valid, enforceable, and binding contract.

**<u>RESPONSE</u>:** Admitted.

107. For System1 to provide the Services more fully set forth in the Ring Agreement, Ring agreed to provide System1 access to its Google AFS account. Ring knew or had reason to know that System1 could not perform the Services without access to the Google AFS account.

**<u>RESPONSE</u>:** Admitted.

108. In exchange for System1 providing the Services more fully set forth in the Ring Agreement, Ring also agreed to pay System1 pursuant to the payment provisions in the Ring Agreement, including, but not limited to, Section 3 of the Services Agreement, and Sections 2(d) and 8(a) of Schedule 1, the Standard Terms and Conditions.

**<u>RESPONSE</u>:** The allegations in this paragraph constitute conclusions of law to which no response is required, and purport to describe the terms of the Ring Agreement. To the extent a response is required, the Ring Agreement speaks for itself, and Defendants refer to the document for its full and complete terms and deny the allegations in this paragraph to the extent inconsistent therewith.

109. System1 has performed all its obligations under the Ring Agreement.

**<u>RESPONSE</u>:** The allegations in this paragraph constitute conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in this paragraph.

110. System1 reasonably understood that the Ring Agreement imposed on Ring an implied duty of good faith and fair dealing to provide System1 with access to Ring's Google AFS account, and to promptly pay System1 in exchange for the Services it provided to Ring on a rolling monthly basis (within three (3) business days of receipt of the Google Monthly Payment but in no

event on less than Net30 terms) and in accordance with the payment terms more fully set forth therein.

**<u>RESPONSE</u>:** The allegations in this paragraph constitute conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in this paragraph.

111. On or about December 30, 2025, Ring breached the duty of good faith and fair dealing by withholding from System1 the benefits to which it was entitled (namely, payment) under the Ring Agreement for the Services that System1 provided to Ring during the preceding calendar month. Specifically, instead of sending System1 a wire payment upon receipt from Google of its Google Monthly Payment for the month of November, Ring retained the entire Google Monthly Payment and not just the Company's Retained Revenue (as contemplated by the express terms of the Ring Agreement) for its own personal gain at System1's expense.

**<u>RESPONSE</u>:** Defendants admit that Ring has not paid System1 the Google Monthly Payment relating to Services provided during November 2025. The remaining allegations in this paragraph constitute subjective or opinion-based statements which are not susceptible of admission or denial, and conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations.

112. On or about January 30, 2026, Ring breached the duty of good faith and fair dealing by again withholding from System1 the benefits to which it was entitled (namely, payment) under the Ring Agreement for the Services that System1 provided to Ring during the preceding calendar month. Specifically, instead of sending System1 a wire payment upon receipt from Google of its Google Monthly Payment for the month of December, Ring retained the entire Google Monthly

Payment and not just the Company's Retained Revenue (as contemplated by the express terms of the Sunday Agreement) for its own personal gain at System1's expense.

**RESPONSE:** Defendants admit that Ring has not paid System1 the Google Monthly Payment relating to Services provided during December 2025. The remaining allegations in this paragraph constitute subjective or opinion-based statements which are not susceptible of admission or denial, and conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations.

113. Ring also unilaterally revoked access to its Google AFS account to which System1 was entitled and on which System1 necessarily relies in order to provide the Services under the Ring Agreement.

**RESPONSE:** Defendants admit that Ring revoked System1's AFS account access. The remaining allegations in this paragraph constitute subjective or opinion-based statements which are not susceptible of admission or denial, and conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations.

114. As a result of Ring's breaches, System1 has suffered damages in an amount not less than $47,646.15, exclusive of interest, fees, and costs all to be determined at trial.

**RESPONSE:** The allegations in this paragraph constitute conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in this paragraph, and deny that Plaintiff is entitled to any of the relief requested.

115. The damages flow directly from and are the natural and probable consequence of Ring's breaches.

**RESPONSE:** The allegations in this paragraph constitute conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations.

**SEVENTH CLAIM FOR RELIEF**
**(In the Alternative, Unjust Enrichment as Against Sunday)**

116. Plaintiff System1 alleges in the alternative to its breach of contract claim, that System1 is entitled to recover under the doctrine of unjust enrichment if it is determined that either a valid and enforceable contract does not exist, the existing contract does not cover the subject matter of the dispute between System1 and Sunday, or the existing contract is void, invalid, or unenforceable.

**RESPONSE:** The allegations in this paragraph constitute conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in this paragraph.

117. Between October and December 2025, System1 provided to Sunday the Services as defined and more specifically described in the Sunday Agreement.

**RESPONSE:** The allegations in this paragraph purport to characterize the terms of the Sunday Agreement. The Sunday Agreement speaks for itself, and Defendants refer to the document for its full and complete terms and deny the allegations in this paragraph to the extent inconsistent therewith. The remaining allegations in this paragraph constitute conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in this paragraph.

118. Sunday was enriched by virtue of System1 providing Sunday with the Services in an amount not less than $7,505,997.44, which represents the amount of Search Revenue due and

payable to System1 for providing the Services to Sunday under the terms of the Sunday Agreement, after deducting the Company's Retained Revenue from the Google Monthly Payment.

**RESPONSE:** The allegations in this paragraph constitute conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in this paragraph.

119. Sunday was aware and had knowledge that System1 was not providing the benefit of the Services gratuitously, that System1 incurred significant actual Out-of-Pocket Expenses in the form of media agency fees/expenses in order to provide the Services and that the Services held a monetary value in the form of the fees and amounts payable to System1 under the Sunday Agreement, which was the monthly Search Revenue less the Company's Retained Revenue.

**RESPONSE:** The allegations in this paragraph constitute conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in this paragraph.

120. System1 has demanded that Sunday make payment to System1 for the Services in an amount of not less than $7,505,997.44 and Sunday has refused to make payment to System1.

**RESPONSE:** Admitted.

121. Sunday has accepted and retained the benefit of the Services inequitably and at System1's expense. Indeed, the Google Monthly Payments are sent directly to Sunday by Google before the amount of Search Revenue less the Company's Retained Revenue must be remitted to System1. If the Search Revenue less the Company's Retained Revenue is not remitted to System1, then the Google Monthly Payment amounts remain in an account over which Sunday has exclusive control.

**RESPONSE:** The allegations in this paragraph purport to characterize the terms of the Sunday Agreement. The Sunday Agreement speaks for itself, and Defendants refer to the document for its full and complete terms and deny the allegations in this paragraph to the extent inconsistent therewith. The remaining allegations in this paragraph constitute conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in this paragraph.

122. System1 and Sunday had a sufficiently close relationship or connection to cause reliance or inducement by System1. System1 and Sunday maintained a business-to-business relationship for several years before entering the Sunday Agreement.

**RESPONSE:** The allegations in this paragraph constitute conclusions of law to which no response is required. To the extent a response is required, Defendants admit that System1 and Sunday Market maintained a relationship prior to entering the Sunday Agreement, and otherwise deny the allegations in this paragraph.

123. As a result of Sunday's retention of the Services and the entire Google Monthly Payments for the months of October through December 2025, System1 has sustained actual and significant damages. Indeed, System1 has incurred damages of not less than $7,505,997.44 in the form of unpaid invoices for the Services that it performed for Sunday pursuant to the Sunday Agreement.

**RESPONSE:** The allegations in this paragraph constitute conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in this paragraph, and deny that Plaintiff is entitled to any of the relief requested.

124. For all the reasons set out above, it is against equity and good conscience to permit Sunday to retain the benefit of the Services in the form of the entire amount of the Google Monthly Payments generated through the Services provided by System1 under the terms of the Sunday Agreement.

**RESPONSE:** The allegations in this paragraph constitute conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in this paragraph, and deny that Plaintiff is entitled to any of the relief requested.

## EIGHTH CLAIM FOR RELIEF
**(In the Alternative, Unjust Enrichment as Against Ring of Media)**

125. Plaintiff System1 alleges in the alternative to its breach of contract claim, that System1 is entitled to recover under the doctrine of unjust enrichment if it is determined that either a valid and enforceable contract does not exist, the existing contract does not cover the subject matter of the dispute between System1 and Ring, or existing contract is void, invalid, or unenforceable.

**RESPONSE:** The allegations in this paragraph constitute conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in this paragraph.

126. Between November and December 2025, System1 provided to Ring the Services as defined and more specifically described in the Ring Agreement.

**RESPONSE:** The allegations in this paragraph purport to characterize the terms of the Ring Agreement. The Ring Agreement speaks for itself, and Defendants refer to the document for its full and complete terms and deny the allegations in this paragraph to the extent inconsistent therewith. The remaining allegations in this paragraph constitute conclusions of law to which no

response is required. To the extent a response is required, Defendants deny the allegations in this paragraph.

127. Ring was enriched by virtue of System1 providing Ring with the Services in an amount not less than $47,646.15, which represents the amount of Search Revenue due and payable to System1 for providing the Services to Ring under the terms of the Ring Agreement, after deducting the Company's Retained Revenue from the Google Monthly Payment.

**RESPONSE:** The allegations in this paragraph constitute conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in this paragraph.

128. Ring was aware and had knowledge that System1 was not providing the benefit of the Services gratuitously, that System1 incurred significant actual Out-of-Pocket Expenses in the form of media agency fees/expenses in order to provide the Services and that the Services held a monetary value in the form of the fees and amounts payable to System1 under the Ring Agreement, which was the monthly Search Revenue less the Company's Retained Revenue.

**RESPONSE:** The allegations in this paragraph constitute conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in this paragraph.

129. System1 has invoiced Ring for the Services it performed in an amount not less than $47,646.15 and Ring has refused to make payment to System1.

**RESPONSE:** Admitted.

130. Ring has accepted and retained the Services inequitably and at System1's expense. Indeed, the Google Monthly Payments are sent directly to Ring by Google before the amount of Search Revenue less the Company's Retained Revenue must be remitted to System1. If the Search

Revenue less the Company's Retained Revenue is not remitted, then the Google Monthly Payment amounts remain in an account over which Ring has exclusive control.

**RESPONSE:** The allegations in this paragraph purport to characterize the terms of the Ring Agreement. The Ring Agreement speaks for itself, and Defendants refer to the document for its full and complete terms and deny the allegations in this paragraph to the extent inconsistent therewith. The remaining allegations in this paragraph constitute conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in this paragraph.

131. System1 and Ring had a sufficiently close relationship or connection to cause reliance or inducement by System1. Mr. Cozzolino, the CEO of Sunday, and with whom System1 had a previous business relationship, also is the sole Manager of and an equity holder of at least 10% of Ring, and which System1 has reason to believe is significantly higher.

**RESPONSE:** Defendants admit that Cozzolino is the CEO of Sunday Market, the sole manager of Ring, and owns a 100% beneficial ownership interest in Ring. The remaining allegations in this paragraph constitute conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in this paragraph.

132. As a result of Ring's retention of the Services and the entire Google Monthly Payments for the months of November through December 2025, Ring has sustained actual and significant damages. Indeed, System1 has incurred damages of not less than $47,646.15 in the form of unpaid invoices for the Services that it performed for Ring pursuant to the Ring Agreement.

**<u>RESPONSE</u>:** The allegations in this paragraph constitute conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in this paragraph, and deny that Plaintiff is entitled to any of the relief requested.

133. For all the reasons set out above, it is against equity and good conscience to permit Ring to retain the benefit of the Services, and the entire amount of the Google Monthly Payments generated through the Services provided by System1 under the terms of the Ring Agreement.

**<u>RESPONSE</u>:** The allegations in this paragraph constitute conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in this paragraph, and deny that Plaintiff is entitled to any of the relief requested.

**<u>NINTH CLAIM FOR RELIEF</u>**
**(Promissory Fraud as Against Sunday)**

134. System1 repeats and realleges the allegations contained in Paragraphs 1 through 133, as if fully set forth herein.

**<u>RESPONSE</u>:** The allegations in this paragraph constitute conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in this paragraph.

135. Sunday, through its representatives and agents, Mr. and Ms. Cozzolino, represented that it intended to establish a Joint Escrow Account from which System1 could properly ensure that it would be paid the System1 Retained Revenue from each Google Monthly Payment via the Joint Escrow Account (or at least ensure that it would not be unjustly and improperly retained by Sunday without any valid or proper justification).

**RESPONSE:** The allegations in this paragraph constitute subjective or opinion-based statements which are not susceptible of admission or denial, and conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in this paragraph.

136. Specifically, Sunday, through its COO, Ms. Cozzolino, initially threatened to terminate the Sunday Agreement based on low Google AFS search revenues generated through System1's Services under the Sunday Agreement. As a result of this threat and instruction on Sunday's behalf to scale revenue during the February 27, 2025 call, System1 significantly scaled the revenue month-over-month beginning in March 2025 (March Google AFS search revenue generated by System1 was three times the February Google AFS search revenue generated by System1, and then increased steadily thereafter) and until such time as it stopped receiving payment from Sunday. The scaled revenue triggered the Sunday Agreement's Joint Escrow Account requirement.

**RESPONSE:** Defendants admit that Ms. Cozzolino discussed the Sunday Agreement in early 2025 with System1, and that System1 increased revenue month-over-month beginning in or around March 2025. The remaining allegations in this paragraph constitute subjective or opinion-based statements which are not susceptible of admission or denial, conclusions of law to which no response is required, and/or purport to characterize the terms of the Sunday Agreement. To the extent a response is required, Defendants refer the Court to the Sunday Agreement, which speaks for itself, deny any allegations inconsistent therewith, and deny the remaining allegations in this paragraph.

137. Instead of working in good faith to establish the Joint Escrow Account, as required by the parties' agreement, Ms. Cozzolino and Mr. Cozzolino, on Sunday's behalf, raised a

pretextual impediment to doing so. Mainly, the Cozzolinos insisted that they would not create a Joint Escrow Account until Sunday migrated its direct Google AFS search revenue to a separate account from the Sunday Google AFS Account. The Cozzolinos, on Sunday's behalf, then made a series of false promises that they would work diligently to migrate the direct search revenue to such separate Google AFS account between March and September 2025 as detailed above, paragraphs 27-45. Despite numerous inquiries from System1 representatives on the status of its efforts to migrate its direct search traffic to a separate and distinct Google AFS account from the Sunday Google AFS Account during this same period, they never did so (and never intended to do so).

**RESPONSE:** Defendants admit that the Cozzolinos took the position that Sunday Market would migrate its direct Google AFS search revenue to a separate account from the Sunday Market Google AFS account before establishing the Joint Escrow Account; that the Cozzolinos corresponded with System1, which correspondence speaks for itself and to which Defendants refer for its full and complete content, denying any allegations inconsistent therewith; and that such migration was not completed. The remaining allegations in this paragraph constitute subjective or opinion-based statements which are not susceptible of admission or denial, conclusions of law to which no response is required, and/or purport to characterize the terms of the Sunday Agreement. To the extent a response is required, Defendants refer the Court to the Sunday Agreement, which speaks for itself, deny any allegations inconsistent therewith, and deny the remaining allegations in this paragraph.

138. Beginning in March 2025, and as set forth more fully above, paragraphs 27-45, Ms. Cozzolino sought to amend the Sunday Agreement to remove the Joint Escrow Account requirement altogether. She raised the pretextual grounds of needing to migrate its direct search

accounts. Despite the Cozzolinos' continued materially false and misleading misrepresentations to the contrary, System1 is informed and believes, and on that basis alleges, that the Cozzolinos on Sunday's behalf never intended to migrate the accounts, nor did they ever intend to provide System1 with equal access to the Retained Revenue through the creation of the Joint Escrow Account.

**RESPONSE:** Defendants admit that the Cozzolinos corresponded with System1, which correspondence speaks for itself and to which Defendants refer for its full and complete content, denying any allegations inconsistent therewith. The remaining allegations in this paragraph constitute subjective or opinion-based statements which are not susceptible of admission or denial, and conclusions of law to which no response is required. To the extent a response is required, Defendants deny the remaining allegations in this paragraph.

139. In reliance on the Cozzolinos' threat of termination of the Sunday Agreement due to lower Google AFS search revenue than Sunday expected, coupled with their false promises of migrating the direct Google AFS search revenue to a separate Google AFS account as a pretextual basis to defer creating the contractually required Joint Escrow Account, System1 promptly scaled the Google AFS search revenue generated within the Sunday Google AFS Account that was supposed to be shared 99% to System1 and 1% to Sunday, to System1's significant detriment.

**RESPONSE:** Defendants admit that System1 increased the Google AFS search revenue generated within the Sunday Google AFS Account during the term of System1's performance. The remaining allegations in this paragraph constitute subjective or opinion-based statements which are not susceptible of admission or denial, conclusions of law to which no response is required, and/or purport to characterize the terms of the Sunday Agreement. To the extent a response is

required, Defendants refer the Court to the Sunday Agreement, which speaks for itself, deny any allegations inconsistent therewith, and deny the remaining allegations in this paragraph.

140. Compounding the harm caused to System1 by such detrimental reliance, System1 expended significant Out-of-Pocket Expenses to generate the System1 and Sunday Retained Revenue, under the misconception that the parties would establish the Joint Escrow Account from which System1 could ensure it received the contractual monthly payments. System1 would not have expended significant Out-of-Pocket Expenses had it known that Sunday never intended to fulfil its false promise to create the Joint Escrow Account and ensure that System1 would in fact receive its share of Retained Revenue.

**RESPONSE:** The allegations in this paragraph constitute subjective or opinion-based statements which are not susceptible of admission or denial, conclusions of law to which no response is required, and/or purport to characterize the terms of the Sunday Agreement. To the extent a response is required, Defendants refer the Court to the Sunday Agreement, which speaks for itself, deny any allegations inconsistent therewith, and deny the remaining allegations in this paragraph.

141. System1's reliance on the Cozzolinos' false promises on Sunday's behalf was justified in that System1 had no reason to doubt the veracity of Sunday's representation about remitting timely, contractual payments given its pre-existing business relationship with Sunday and Mr. Cozzolino, and its prior course of conduct of timely remitting payments to System1.

**RESPONSE:** Defendants admit to a course of conduct of paying System1 according to the payment provisions in the Sunday Agreement. The remaining allegations in this paragraph constitute subjective or opinion-based statements which are not susceptible of admission or denial, or conclusions of law to which no response is required. To the extent a response is required,

Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

142. System1 has been harmed as a direct and proximate cause of relying on the Cozzolinos' false promises. It incurred significant Out-of-Pocket Expenses associated with the Services it performed. System1 is entitled to an award of damages in an amount to be determined at trial.

**RESPONSE:** The allegations in this paragraph constitute conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in this paragraph, and deny that Plaintiff is entitled to any of the relief requested.

**RELIEF DEMANDED**

WHEREFORE, plaintiff System1 respectfully prays for and demands judgment be granted in its favor and against defendants Sunday and Ring, as follows:

(i) Awarding, on plaintiff's breach of contract claims, specific performance directing Sunday and Ring to pay the outstanding indebtedness in an amount not less than $7,553,643.59, together with interest, fees, costs, and such other and further relief as the Court deems just and proper;

(ii) In the alternative, awarding, on plaintiff's breach of the implied duty of good faith and fair dealing claims, damages in an amount to be determined at trial but in no event less than $7,553,643.59, together with interest, fees, and costs, and such other and further relief as the Court deems just and proper;

(iii) In the alternative, awarding, on plaintiff's unjust enrichment claims, damages in an amount to be determined at trial but in no event less than $7,553,643.59, together with interest, fees, and costs, and such other and further relief as the Court deems just and proper;

(iv) Awarding, on plaintiff's promissory fraud claim, damages in an amount to be determined at trial, together with interest, fees, and costs, and such other and further relief as the Court deems just and proper; and

(v) Awarding, on all claims for relief, all fees, costs and such other and

further relief as the Court deems just and proper.

**RESPONSE:** Defendants deny that Plaintiff is entitled to any of the relief requested.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

Plaintiff's Complaint, and each cause of action stated therein, fails to state a valid claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by its failure to perform all of its obligations under the Agreements.

### THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by its prior material breach of the Agreements.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because Plaintiff seeks quasi-contract, equitable, or other relief that is foreclosed by the existence of applicable, binding contracts between the parties.

### FIFTH AFFIRMATIVE DEFENSE

Any damages allegedly suffered by Plaintiff were caused, in whole or in part, by Plaintiff's own conduct.

### SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims and/or recovery of damages are barred, in whole or in part, by the doctrine of setoff and/or offset.

**SEVENTH AFFIRMATIVE DEFENSE**

Plaintiff's damages, if any, are speculative and incapable of being ascertained with the requisite certainty.

**EIGHTH AFFIRMATIVE DEFENSE**

Plaintiff's claims are barred, in whole or in part, by the doctrines of estoppel and waiver.

**NINTH AFFIRMATIVE DEFENSE**

Plaintiff's claims are barred, in whole or in part, by Plaintiff's failure to satisfy one or more conditions precedent.

**TENTH AFFIRMATIVE DEFENSE**

Plaintiff's claims are barred, in whole or in part, by Plaintiff's failure to mitigate its alleged damages.

**ELEVENTH AFFIRMATIVE DEFENSE**

Plaintiff's claims are barred, in whole or in part, by the doctrine of unclean hands and/or Plaintiff's bad faith.

**TWELFTH AFFIRMATIVE DEFENSE**

Plaintiff's claims are barred, in whole or in part, by documentary evidence.

**THIRTEENTH AFFIRMATIVE DEFENSE**

Plaintiff's claims are duplicative and would result in an unlawful double recovery.

**FOURTEENTH AFFIRMATIVE DEFENSE**

Plaintiff's claims and/or recovery of damages are barred, in whole or in part, by binding terms in the Agreements, including those limiting liability and quantum of recoverable damages.

**FIFTEENTH AFFIRMATIVE DEFENSE**

Plaintiff's recovery of damages is barred, in whole or in part, by having already been made whole.

## RESERVATION OF RIGHTS

Defendants expressly reserve their right to amend or supplement this Answer and any Affirmative Defenses contained herein, including Defendants' rights to assert any additional defenses. Defendants' assertion of an Affirmative Defense does not assume the burden of proof for any issue as to which applicable law places the burden on Plaintiff as an element of its claim or otherwise.

WHEREFORE, Defendants deny that Plaintiff is entitled to the relief demanded in its Complaint and respectfully requests that the Court enter judgment in their favor and against Plaintiff, dismissing Plaintiff's Complaint with prejudice, and awarding Defendants' their attorneys' fees, costs, and such other relief as the Court deems just and proper.

**[remainder of page intentionally left blank]**

## COUNTERCLAIMS

Defendant and Counterclaim-Plaintiff Sunday Market Media Inc. ("Sunday Market" or "Counterclaim-Plaintiff"), by and through its counsel Reed Smith LLP, hereby asserts the following Counterclaims ("Counterclaims") against Plaintiff and Counterclaim-Defendant System1 OpCo, LLC ("System1" or "Counterclaim-Defendant") and allege as follows:

## INTRODUCTION

1. This action is about System1's willful destruction of immensely valuable advertising assets owned by Sunday Market, through advertising fraud and deception. Sunday Market entrusted the day-to-day use of those assets to System1, but retained ownership—only for System1 to permanently destroy the assets' value by grossly misusing them for System1's own interests.

2. In 2024, the parties executed a services agreement (the "Sunday Agreement") which set forth the terms by which System1 would administer certain internet subdomains owned by Sunday Market (the "Domains"), in exchange for a share of the Domains' advertising revenue.[2]

3. This business model—both the Domains' earnings from month to month, and their overall value as assets—depended on the Domains' commercial relationship with Google, a titan in the online advertising space. Countless websites participate in Google's AdSense program to earn advertising revenue in collaboration with Google, including the Domains. In fact, the Domains enjoyed a specific, privileged revenue-sharing relationship with Google, due to Sunday Market's hard work developing its digital assets before System1 ever got involved.

4. Consequently, both the Domains' advertising earnings from day to day, and their

[2] As a technical matter, though the Sunday Agreement refers to them as "Subdomains," the domains in question are root domains. The defined term "Domains" herein includes all subdomains on the root domain.

overall value as assets owned by Sunday Market, depended on compliance with the policies set by Google—and System1 knew it.

5. In the second half of 2025, Google adjusted its policies on advertising in several respects. Among other things, Google tightened restrictions on fake traffic, such as the use of bots to artificially inflate websites' views, which is effectively a form of advertising fraud. System1 was well aware of these new policies, and of the consequences for failing to abide by them.

6. Instead, System1 flouted Google's requirements, and by doing so permanently destroyed the Domains' value.

7. In late November 2025, after Google had shut down numerous of System1's other ventures, System1 reacted by deliberately flooding the Domains with fake traffic. In just a few days, "click spam" doubled, and the Domains' impressions purportedly shot up by 50% or more.

8. This highly suspicious spike in traffic was noticed immediately, and triggered safeguards, leading to a crackdown by Google and the revocation of the Domains' premium AdSense account status, effectively destroying the Domains' commercial viability. Upon revocation of that status, the Domains' performance plummeted. Within weeks, earnings were roughly 1% of what they had been before System1's flagrant resort to fraudulent traffic.

9. The damage is permanent. Revocation of the Domains' status with Google cannot be undone. Consequently, the Domains' earnings will remain a tiny fraction of what they were prior to System1's misconduct.

10. For the same reason, the Domains are now a toxic asset with effectively no value. Before System1 poisoned the well, the Domains had the proven capability to generate millions of dollars a month in ad revenue and six years of pristine history: as such, they would have commanded a sale price of $100 million or more. Now, as a consequence of System1's actions,

the Domains are virtually worthless. No buyer will pay a meaningful amount for digital assets that Google has penalized for fraudulent activity.

11. Thus, Sunday Market brings these Counterclaims to hold System1 accountable for its willful misconduct and redress the grave harm System1 caused, by recovering full compensatory damages—to be proven at trial, but certainly in excess of $50,000,000—as well as punitive damages, attorneys' fees, and all other appropriate remedies.

**PARTIES**

12. Counterclaim-Plaintiff Sunday Market Media Inc. is a corporation organized under the laws of British Columbia, Canada, and has its principal place of business in Victoria, British Columbia. Sunday Market Media is a web publishing company.

13. Counterclaim-Defendant System1 OpCo, LLC is a limited liability company organized under the laws of Delaware, with its principal place of business in Los Angeles, California. System1 advertises itself as an "industry-leading omnichannel digital marketing platform, powered by Machine Learning and AI, that monetizes internet traffic by putting the right ads in front of the right people at the right time."[3]

**JURISDICTION AND VENUE**

14. This Court has subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1332(a)(2) as there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

15. This Court has personal jurisdiction over System1, and venue is properly placed in this district for this action, pursuant to a mandatory forum selection clause in the Sunday Agreement, whereby System1 agreed that Sunday Market must bring any claims arising out of the

---

[3] *See* https://system1.com/what-we-do.

Sunday Agreement in the state and federal courts of New York County, New York.

16. In the alternative, this Court has personal jurisdiction over System1 based on N.Y. CPLR § 301, in that, upon information and belief, System1 is registered to do business in New York; is listed and trades on the New York Stock Exchange; and otherwise transacts business in New York regularly, consistently, and extensively so as to subject System1 to general jurisdiction. Accordingly, venue in this Court is proper under 28 U.S.C. § 1391(b)(3).

17. In the alternative, this Court has personal jurisdiction over System1 based on N.Y. CPLR § 302(a)(1), (a)(2), and/or (a)(3). Accordingly, venue in this Court is proper under 28 U.S.C. § 1391(b)(3).

## FACTUAL BACKGROUND

### I. Sunday Market Grows a Prosperous and Successful Web Advertising Business

18. Sunday Market was founded in 2016 as an internet marketing company and quickly grew into a successful, prosperous enterprise. Over several years of diligent leadership and cultivation, Sunday Market developed client relationships with major companies including Amazon, Instacart, and Apple Music. At the time, Sunday Market's business model consisted of servicing these partners by helping them define and achieve their online marketing goals.

19. In 2019, Sunday Market began investing in web publishing, relying on the ownership and exploitation of domains, which involves a different business model.

20. "Domain" is a term of art; it effectively means a website, a space on the internet that may comprise numerous individual webpages. A "domain name" is the name of the website, such as "google.com", "wikipedia.org", or "congress.gov"; a user types the domain name into a web browser in order to navigate to a given domain. Thus, Wikipedia is a domain; Wikipedia.org is its domain name (as distinct from "https://www.wikipedia.org/", the URL also used to navigate to the domain, of which the domain name is a part); and within the Wikipedia domain are numerous

subdomains, such as the English Wikipedia (en.wikipedia.org), and individual webpages, such as the page about this Court.

21. Sunday Market's post-2019 business model entails acquiring domains and managing them in a way that organically attracts user traffic. Sunday Market writes content—articles, news items, other topics of interest—for those domains, and promotes the domains on social media, Google Search, and elsewhere.

22. This, in turn, generates advertising revenue for Sunday Market: advertisers who place ads on Sunday Market's domains will pay more as the number of users who view the domains and see those ads increase. For instance, common metrics in the online advertising industry include "cost-per-click," the amount an advertiser pays a domain owner for each click on the given ad, or "RPM," meaning the amount of revenue a domain receives per 1,000 user impressions.

23. Sunday Market made a strong name for itself in the web publishing industry. By 2022, Sunday Market was successful enough to secure a rare and lucrative premium relationship with Google, which is an immensely important player in the online advertising industry.

24. Specifically, Google offered Sunday Market a premium status with Google AdSense—the service that Google offers to website owners, allowing Google to place ads on their domains in exchange for payments from Google—called Related Search for Content ("RSC"). This relationship was governed by contract between Google and Sunday Market.

25. Under the terms of Sunday Market's premium RSC relationship with Google, when users search keywords on Sunday Market's domains (comparable to, for instance, searching for "Southern District of New York" on Wikipedia), that user is redirected to Google, which then (1) bundles that search into Google Search, (2) monetizes it on Google's end, and (3) shares part of the resultant revenue with Sunday Market. In effect, this relationship allows search traffic outside

of Google Search to be monetized as if part of Google Search: a lucrative arrangement for both Sunday Market and Google.

26. Inauthentic traffic in all its forms is a major problem for the online advertising industry, however, as it artificially increases metrics like views and impressions without actually relaying ads to a human viewer. Thus, using "bots" or other forms of traffic not organically generated by bona fide users effectively defrauds advertisers and other payors such as Google, by seeking to extract higher revenue-sharing from them on false pretenses.

## II. System1 Contracts for Day-to-Day Management of Sunday Market's Domains

27. In late 2023, System1—having heard of Sunday Market's privileged relationship with Google—approached Sunday Market to propose a collaboration based on that relationship.

28. System1 offered to direct user traffic that it controlled to domains owned by Sunday Market, thus significantly increasing views and impressions, and therefore the domains' ad revenue, in exchange for a large share of that revenue. At the time, this seemed to Sunday Market like a good-faith, mutually profitable business opportunity.

29. On October 15, 2024, the parties executed the Sunday Agreement, which governs the terms of their collaboration concerning the Domains.

30. Broadly speaking, the Sunday Agreement calls for System1 to manage the Domains consistent with applicable laws and standards, in exchange for Sunday Market remitting a 99% share of the ad revenue the Domains earned via Google.

31. A schedule to the Sunday Agreement identifies the Domains at issue as the following: kaleandcardio.com, followsports.com, mdrntoday.com, investingfuel.com, heroinvesting.com, petfools.com, and gazillions.com. Other Domains (travelroo.com, factfeed.com, latestinsports.com, quantanswers.com, and sportsmound.com) would ultimately be administered by System1 as well.

32. In respect of those Domains, System1 undertook to provide the full range of "the Services" as identified on the cover page of the Sunday Agreement: Ad Serving Technology Services, Account Management Services, Content Creation & Website Development Services, Revenue Reporting Services, and Webhosting Services. *See id.* at 1 (cover page). Each of these terms is defined in Section 1 of the Sunday Agreement.

33. Among other requirements and commitments, System1 represented and warranted that the performance of its obligations under the Sunday Agreement would "comply with all laws, rules and regulations[.]" The Sunday Agreement also repeatedly confirms System1's obligation to employ "**valid** internet traffic" (emphasis added) in the performance of its obligations and services. Indeed, Section 3 identifies the "purposes of directing, referring or acquiring valid internet traffic to any of the [Sunday Market] Website(s)" as the basic contemplation of the Sunday Agreement.

34. In consideration for these services, the parties agreed on a revenue split: Sunday Market would remit to System1 99% of the revenue generated by the Domains and collected by Sunday Market from Google, while Sunday Market would keep 1%.

35. Although System1 would have broad access to the Domains in order to perform the Services, to the point of handling the majority of the Domains' day-to-day administration and management, Sunday Market retained ownership of the Domains.

36. System1 had other arrangements, similar to that under the Sunday Agreement, with other web publishing companies like Sunday Market.

## III. System1 Destroys the Domains' Value with Fake Traffic

37. The parties' relationship continued, apparently without issue, for approximately a

year.

38. System1's administration greatly increased the traffic through the Domains, and correspondingly increased their ad revenue as well. By early October 2025, for instance, the Domains were reliably earning between $100,000 and $190,000 per day, equating to $4 million to $5 million per month.

39. In the second half of 2025, Google imposed new policies governing the Google AdSense program, and thus Google's collaboration with partners like Sunday Market.

40. For instance, effective August 25, 2025, Google conditioned access to certain AdSense account features on compliance with policy requirements imposed by Google. Failure to remain in good standing, due to violations identified by Google, could lead to revocation of the AdSense relationship entirely, and/or chargebacks applied by Google to such an account's earnings.

41. Google's new policies expressly dictated that noncompliant accounts would be punished regardless of whether a third party actually operated the domains causing the noncompliance, as was the case with the relationship between Sunday Market and System1.

42. Among other things, Google's policy changes created a stricter, more severe stance against the use of inauthentic traffic.

43. System1 was fully aware of these policy changes, having discussed them numerous times with Sunday Market; fully aware of the consequences of noncompliance; and fully able to comply with Google's new policies. In particular, System1 was well aware that failure to comply with Google's policies would result in the Domains losing their privileged relationship with Google AdSense, and that this would destroy the Domains' revenue stream.

44. Yet, System1 willfully and in grossly negligent fashion chose to ignore and

disregard these new policies when conducting business.

45. Upon information and belief, in the approximately three months between Google's new policies taking effect and late November 2025, many (if not all) of System1's similar partnerships with companies other than Sunday Market were shut down or abandoned. Upon information and belief, this was because System1, in administering these other companies' domains, failed to comply with the new Google policies, which directly caused Google to crack down and cut off those domains' AdSense earnings, rendering them worthless.

46. As System1 lost its other business ventures, it responded by dumping toxic artificial traffic onto the Domains and its relationship with Sunday Market, apparently seeking to preserve its profits at least a little longer.

47. This caused overall traffic, along with telltale indicia of fraudulent activity, to spike dramatically in late November 2025, as System1 implemented its scheme.

48. For instance, throughout most of November 2025 the Domains' impressions had remained stable, between 200,000 and 350,000 per day. But beginning on or around November 21, 2025, impressions abruptly started rising sharply, peaking at over 515,000 on November 24.

49. This correlated with a similar rise in earnings: during most of November, the Domains earned between $100,000 and $170,000 per day. That figure, too, dramatically rose beginning on or around November 21, 2025, and peaked on November 24 at over $250,000 per day.

50. Google immediately noticed the suspicious increase and responded. For instance, on November 26, 2025, a Google representative contacted Sunday Market to flag the suspicious activity and ask what had happened. The representative explicitly noted that (1) impressions and page views had "started aggressively increasing" on November 22nd; and (2) on November 25,

RPM (revenue per thousand impressions) had "tank[ed]" even as "Click Spam"—a term for inauthentic, bot-driven traffic in contrast to genuine users—increased "to ~2x the account average and the highest it's been in the past 30 days[.]"

51. Subsequently, on December 1, 2025, a separate Google representative advised Sunday Market that "click spam for investingfuel.com and travelroo.com were the highest and really took over the past 10-15 days."

52. Consequently, the dramatic spike was immediately followed by an even more dramatic slump. System1's flagrant use of inauthentic traffic triggered severe restrictions on the Domains' Google AdSense accounts, causing traffic and revenue to plummet.

53. For instance, by December 1, 2025, the Domains' impressions were down to 90,000 per day: 25-50% of the daily norm in November 2025, before System1's bot-driven increase. Earnings per day were down to approximately $19,000, about 10-20% of the pre-increase daily norm.

54. The slump only worsened. By mid-December, impressions were down to roughly 37,000 per day, and earnings had fallen by an even greater proportion, down to $2,800 per day—roughly 1% of what earnings had been before System1 flooded the Domains with fake traffic.

55. Further, effective November 24, 2025, Google applied a chargeback of about $114,000 to Sunday Market's AdSense account. While minor chargebacks are not uncommon, Sunday Market had never experienced a chargeback on this scale, underscoring the extraordinary and brazen nature of System1's misconduct.

56. Worst of all, System1's actions permanently destroyed the Domains' status with Google AdSense, rendering the Domains effectively worthless.

57. As the direct, automatic, and forewarned consequence for System1's flagrant

violation of Google policies, the Domains' privileged relationship with Google was revoked, and they and became subject to a "Restricted" status. The revocation of the Domains' premium AdSense account status is permanent and cannot be cured.

58. The revocation of status destroys the Domains' ability to earn revenue via Google. As noted above, in a matter of days between late November and mid-December, the Domains' earnings fell by nearly 99%, where they remain currently and will remain. The Domains cannot return to the revenue stream they enjoyed before System1's sabotage.

59. Moreover, this in turn destroys the Domains' inherent value. Sunday Market still owns, and has at all times owned, the Domains; notwithstanding the 99%-1% revenue sharing arrangement, the inherent value of the Domains as an asset has always belonged to Sunday Market. Before System1's misconduct, Sunday Market could have sold the Domains to a third party for $100 million or more, based on their demonstrated ability to generate millions of dollars a month in revenue. That is now impossible: the Domains' sale value is virtually nil, since no buyer would pay a significant amount to acquire domains that Google will not work with.

60. Thus, System1's willful and egregious misconduct has directly cost Sunday Market millions of dollars in earnings and asset value. Sunday Market is entitled to be made fully whole.

61. Moreover, there is significant concern as to System1's ability to satisfy Sunday Market's claim. System1 is a publicly traded company, and publicly-available information makes it clear that its financial health is in dire shape. Over the last five years, System1's stock price has dropped 97%; over the last six months, it is down 43.4%. SEC filings disclose that, on December 8, 2025, System1 received notice from the New York Stock Exchange that it was not in compliance with the NYSE's listing standards, and risked delisting, because System1's 30-day average market capitalization and last reported stockholder's equity were both below $50 million. Thus, it is

imperative that Sunday Market seek relief as expeditiously as possible.

## **FIRST COUNTERCLAIM**[4]
**(Fraud by Omission)**

62. Sunday Market repeats and re-alleges each of the foregoing allegations as if fully set forth herein.

63. System1 misrepresented crucial, material facts to Sunday Market, by not disclosing to Sunday Market that System1 was using inauthentic traffic to artificially boost the Domains' advertising metrics and revenues.

64. System1 was under a legal duty to disclose this information to Sunday Market because, *inter alia*, System1's covert use of inauthentic traffic in a manner that jeopardized the Domains' relationship with Google, and thus their fundamental viability and value, was a material fact of which System1 had exclusive knowledge. Additionally, in discussing the unusual spike in activity with Sunday Market in November 2025, System1 actively concealed the truth about its use of inauthentic traffic and instead disclosed select facts, while withholding that essential fact, to cover its misconduct.

65. System1 knew that it was deceiving Sunday Market and providing false information by failing to disclose its use of inauthentic traffic on the Domains.

66. By withholding information about its use of inauthentic traffic, System1 acted with

[4] While the Sunday Agreement contains a New York choice-of-law clause, it expressly applies only to the Sunday Agreement itself and claims "arising out [of] this Agreement[.]" Such clauses do not extend to tort claims, which are the majority of Sunday Market's counterclaims here. The substantive law governing these tort claims is instead determined by the choice-of-law principles of New York as the forum state, *i.e.* interest analysis. Here, System1 is headquartered in Los Angeles and therefore, upon information and belief, undertook its tortious actions in and from Los Angeles. Also, many of the key facts involve Google and its rules and actions; Google is also based in California. Sunday Market therefore submits that the substantive law of California governs its tort claims, and has pled them accordingly.

actual intent to defraud and deceive Sunday Market. System1 intended to conceal from Sunday Market, and mislead Sunday Market about, its use of inauthentic traffic on the Domains in violation of Google policies and at grave risk to the Domains' continued value.

67. Sunday Market justifiably relied on the contrary picture of honesty and good-faith conduct presented by System1. In particular, given System1's undertakings in the Sunday Agreement to comply with applicable law and rules, and to direct valid internet traffic to the Domains, Sunday Market was relying on System1 not to use inauthentic traffic and was justified in doing so. Had Sunday Market known that System1 was using inauthentic traffic to boost the Domains' performance, Sunday Market would have immediately taken action, such as cutting off System1's access to the Domains and ending the wrongdoing.

68. As a result of System1's conduct and Sunday Market's justifiable reliance on its incomplete representations and disclosures, Sunday Market has suffered substantial losses, including, but not limited to, (1) the loss of virtually all of the Domains' worth and value as an asset, (2) the difference between Sunday Market's revenue from the Domains prior to November 21, 2025 and the *de minimis* earnings that the Domains are now reduced to, and (3) permanent damage to Sunday Market's essential commercial relationship with Google.

69. As a result of System1's fraudulent concealment of material information, Sunday Market is entitled to compensatory damages in an amount to be proven at trial, but no less than $50,000,000, plus pre- and post-judgment interest.

70. Furthermore, Sunday Market is entitled to punitive damages in an amount to be determined at trial, and recovery of its attorneys' fees and costs to the full extent permitted by law.

**SECOND COUNTERCLAIM**
**(Breach of Contract)**

71. Sunday Market repeats and re-alleges each of the foregoing allegations as if fully

set forth herein.

72. The Sunday Agreement is a valid contract between Sunday Market and System1, and is enforceable in all respects.

73. Sunday Market fully performed all of its obligations under the Sunday Agreement.

74. Under Section 10(a)(ii) of the Agreement, System1 represented and warranted that the "performance of its obligations [would] comply with all laws, rules and regulations[.]" System1 breached this obligation by fraudulently, deceptively, and improperly using inauthentic traffic in November 2025 to artificially inflate the Domains' advertising metrics and income, in violation of Google's rules and applicable law.

75. Section 3 of the Sunday Agreement also provides that System1 shall have certain rights "in connection with performing the Agency Management Services and any other obligations under this Agreement for purposes of directing, referring or acquiring valid internet traffic to any of the [Sunday Market] Website(s) as contemplated by this Agreement." The Sunday Agreement's basic premise that System1 would direct valid, authentic internet traffic to the Domains is further corroborated by language in the definition of the term "Agency Partners" in Section 1 (i.e. entities that, inter alia, have been "engaged or retained by System1 on behalf of [Sunday Market] to direct, refer or acquire valid internet traffic to the Subdomains on the Company Website(s) as contemplated by this Agreement"), and other references throughout the Sunday Agreement to "valid" queries and users.

76. Under Section 2(a) of the Sunday Agreement, System1 undertook to "work with [Sunday Market] in order to implement all of the Services . . . on the Subdomains of the [Sunday Market] Website(s) as contemplated by this Agreement." As noted in the previous paragraph, "as contemplated by this Agreement" entails System1's direction of <u>valid</u> internet traffic in carrying

out its services and obligations.

77. Not only did System1 breach these terms, it did so in a willful, deliberate, and/or grossly negligent manner. System1 acted out of bad-faith malice toward Sunday Market—willfully violating Google policies in full knowledge that Sunday Market would suffer the consequences and its relationship with Google would be permanently sabotaged—or, at minimum, in subjective awareness of and reckless disregard for the harms that System1 knew would occur.

78. System1's willful and reckless breaches of these obligations have caused Sunday Market to suffer substantial losses, including, but not limited to, (1) the loss of virtually all of the Domains' worth and value as an asset, (2) the difference between Sunday Market's revenue from the Domains prior to November 21, 2025 and the *de minimis* earnings that the Domains are now reduced to, and (3) permanent damage to Sunday Market's essential commercial relationship with Google.

79. As a result of System1's breaches, Sunday Market is entitled to compensatory damages in an amount to be proven at trial, but no less than $50,000,000, plus pre- and post-judgment interest.

**<u>THIRD COUNTERCLAIM</u>**
**(Negligence – Willful Misconduct)**

80. Sunday Market repeats and re-alleges each of the foregoing allegations as if fully set forth herein.

81. Under applicable law, System1's contractual undertaking via the Sunday Agreement to perform services, *i.e.* managing the Domains' advertising functions on a day-to-day basis, necessarily entailed a legal duty toward Sunday Market to perform those services in a competent and reasonable manner. Thus, System1 was bound by a duty of care toward Sunday Market.

82. System1 breached that duty of care by intentionally and flagrantly routing inauthentic traffic through the Domains in November 2025.

83. System1 acted in full awareness that (1) this was a grave breach of the Google policies that the Domains' value and earnings relied upon, and that (2) the prescribed penalties for such a breach would—inevitably, not merely possibly—render the Domains worthless. System1 was well familiar with Google's policies in this regard and the consequences, for Sunday Market and for the Domains, of any violation caused by System1.

84. System1 acted willfully and intentionally, with the deliberate intention of harming Sunday Market. At absolute minimum, System1 intentionally and actively chose to disregard the damage to Sunday Market that System1 knew would ensue from its heavy use of inauthentic traffic.

85. System1's egregious and intentional violation of its duty of care toward Sunday Market directly caused Sunday Market to suffer substantial losses, including, but not limited to, (1) the loss of virtually all of the Domains' worth and value as an asset, (2) the difference between Sunday Market's revenue from the Domains prior to November 21, 2025 and the *de minimis* earnings that the Domains are now reduced to, and (3) permanent damage to Sunday Market's essential commercial relationship with Google.

86. As a result of System1's intentional misconduct, Sunday Market is entitled to compensatory damages in an amount to be proven at trial, but no less than $50,000,000, plus pre- and post-judgment interest.

87. Furthermore, Sunday Market is entitled to punitive damages in an amount to be determined at trial, and recovery of its attorneys' fees and costs to the full extent permitted by law.

**<u>FOURTH COUNTERCLAIM</u>**
**(Negligence – Gross Negligence)**

88. Sunday Market repeats and re-alleges each of the foregoing allegations as if fully set forth herein.

89. Under applicable law, System1's contractual undertaking via the Sunday Agreement to perform services, *i.e.* managing the Domains' advertising functions on a day-to-day basis, necessarily entailed a legal duty toward Sunday Market to perform those services in a competent and reasonable manner. Thus, System1 was bound by a duty of care toward Sunday Market.

90. System1 breached that duty of care by intentionally and flagrantly routing inauthentic traffic through the Domains in November 2025.

91. System1 acted in full awareness that (1) this was a grave breach of the Google policies that the Domains' value and earnings relied upon, and that (2) the prescribed penalties for such a breach would—inevitably, not merely possibly—render the Domains worthless. System1 was well familiar with Google's policies in this regard and the consequences, for Sunday Market and for the Domains, of any violation caused by System1.

92. System1's deliberate and willful use of inauthentic traffic to temporarily boost revenue, in full knowledge that this was against Google policies and would destroy the Domains' value, reflects absence of any level of care whatsoever, and an extreme departure from the standards of conduct required by System1's duty toward Sunday Market.

93. System1's egregious and reckless violation of its duty of care toward Sunday Market directly caused Sunday Market to suffer substantial losses, including, but not limited to, (1) the loss of virtually all of the Domains' worth and value as an asset, (2) the difference between Sunday Market's revenue from the Domains prior to November 21, 2025 and the *de minimis*

earnings that the Domains are now reduced to, and (3) permanent damage to Sunday Market's essential commercial relationship with Google.

94. As a result of System1's grossly negligent conduct, Sunday Market is entitled to compensatory damages in an amount to be proven at trial, but no less than $50,000,000, plus pre- and post-judgment interest.

**FIFTH COUNTERCLAIM**
**(Tortious Interference with Contract)**

95. Sunday Market repeats and re-alleges each of the foregoing allegations as if fully set forth herein.

96. Sunday Market had a valid agreement with Google regarding participation of the Domains in the Google AdSense program, which required the Domains to maintain compliance with Google policies, including those concerning inauthentic traffic.

97. System1 had actual knowledge of Sunday Market's agreement with Google, as this was the premise for System1's management of the Domains pursuant to the Sunday Agreement. Indeed, System1 approached Plaintiff in the first place because System1 was aware of the nature of Plaintiff's relationship with Google.

98. System1 intentionally acted to disrupt, or cause breach of, Sunday Market's relationship with Google, by routing large volumes of inauthentic traffic through the Domains in late November 2025. System1 knew that doing this would violate Google policies, that Sunday Market would be held responsible by Google, and that its action would cause termination of Sunday Market's relationship with Google.

99. Disruption and breach of Sunday Market's relationship in fact occurred, since System1 routed inauthentic traffic through the Domains in violation of Google policies. Per the terms of Sunday Market's agreement with Google, Sunday Market as owner of the Domains was

responsible for ensuring that the Domains remained in compliance with Google policies, notwithstanding that Sunday Market had separately contracted with System1 and entrusted the majority of the Domains' day-to-day administration to System1.

100. As a result of the disruption and breach caused by System1, Google terminated its relationship with Sunday Market, causing Sunday Market to suffer substantial losses, including, but not limited to, (1) the loss of virtually all of the Domains' worth and value as an asset, (2) the difference between Sunday Market's revenue from the Domains prior to November 21, 2025 and the *de minimis* earnings that the Domains are now reduced to, and (3) permanent damage to Sunday Market's essential commercial relationship with Google.

101. As a result of System1's tortious interference, Sunday Market is entitled to compensatory damages in an amount to be proven at trial, but no less than $50,000,000, plus pre- and post-judgment interest.

**PRAYER FOR RELIEF**

**WHEREFORE**, for all of the foregoing reasons, Sunday Market demands judgment against System1 as follows:

a. On all Counterclaims, compensatory damages in an amount to be proven at trial, but no less than $50,000,000, plus pre- and post-judgment interest.

b. On the First and Third Counterclaims, awarding Sunday Market punitive damages from System1 in an amount to be determined at trial.

c. On the First Counterclaim, awarding Sunday Market its attorneys' fees and costs incurred in remedying System1's misconduct and litigating this action; and/or indemnifying Sunday Market its attorneys' fees and costs incurred as a result of any and all breaches of representations or warranties made by System1, pursuant to the Sunday Agreement.

d. Awarding such other and further relief as this Court may deem just and proper.

Dated: April 23, 2026
New York, New York

**REED SMITH LLP**

/s/ Casey D. Laffey

Casey D. Laffey
John P. Kennedy
599 Lexington Avenue, 22nd Floor
New York, New York 10022
Tel: 212-521-5400
Fax: 212-521-5450
Email: claffey@reedsmith.com
Email: jkennedy@reedsmith.com

Allison L. Kahn (*pro hac vice*)
515 S. Flower Street, Suite 4300
Los Angeles, CA 90071
Tel: 213-457-8000
Fax: 213-457-8080
Email: akahn@reedsmith.com

*Counsel for Defendant and Counterclaim-Plaintiff Sunday Market Media Inc., and Defendant Ring of Media LLC*